ALUMA SYSTEMS, INC., *et al.*, Plaintiffs-Appellants, v. FREDERICK QUINN CORPORATION *et al.*, Defendants-Appellees.

First District (5th Division)   No. 1—87—3072

Opinion filed November 30, 1990.

Nigro & Westfall, P.C., of Glendale Heights, for appellant.

O'Halloran, Lively & Walker, of Chicago (Paul T. Lively, of counsel), for appellees Frederick Quinn Corporation and Firemen's Insurance Company of Newark.

PRESIDING JUSTICE COCCIA delivered the opinion of the court:

On July 30, 1985, the Capitol Development Board (CDB), an agency of the State of Illinois, entered into a contract with Frederick Quinn Corporation (Quinn), as general contractor, for the construction of the Biotechnology Research Facility (hereafter the Project), part of Chicago Technology Park at the University of Illinois, Chicago, Illinois. Quinn subcontracted a portion of its work, i.e., the concrete work, to C. Dew & Son, Inc. (Dew), which in turn subcontracted the concrete forming work to Conform Erectors, Inc. (Conform). Under the terms of a written agreement executed on or about September 9, 1985, Conform rented a variety of aluminum beam and other construction equipment from the plaintiff, Aluma Systems, Inc., a foreign corporation licensed to do business in Illinois. The contract between Conform and Aluma specifically stated that the equipment was rented for a three-month period, for use at the Project construction site. Conform, which never paid Aluma the amount due under the rental agreement, has since gone out of business and apparently filed for bankruptcy after the filing of this appeal.

In an effort to recover the $20,953.78 which it claims it is owed for its contribution to the Project, Aluma sought a remedy pursuant to section 23 of the Mechanics' Liens Act (Ill. Rev. Stat. 1985, ch. 82, par. 23) (hereinafter referred to as section 23), which allows subcontractors of a general contractor employed by a public body to establish a lien on funds, in possession of the public body, which have not yet been paid out to the general contractor. It simultaneously brought a claim pursuant to "An Act in relation to *** contracts for public construction" (Ill. Rev. Stat. 1985, ch. 29, pars. 15, 16) (hereinafter referred to as the Bond for Public Works Act, or the Bond Act),

which permits recovery, on the general contractor's surety bond, of payments for labor and materials used in public construction projects. Firemen's Insurance Company of Newark, New Jersey (Firemen's), a defendant in this case and a party to this appeal, was Quinn's surety for the Project under the terms of a payment bond, to be discussed more fully below. Aluma is appealing from certain orders of the circuit court of Cook County, chancery division, dismissing with prejudice both counts of its complaint: count I, asserting a claim under section 23; and count II, relying on the Bond Act.

In order to adequately explain the issues raised by the parties and our resolution of those issues, it is necessary to set out the procedural history of this litigation in the context of the statutory requirements which govern the plaintiff's claims. Section 23, the section of the Mechanics' Liens Act (the Act) (Ill. Rev. Stat. 1985, ch. 82, par. 1 *et seq.*) pertaining to public improvements, provides in relevant part:

> "Any person who shall furnish material, apparatus, fixtures, machinery or labor to any contractor having a contract for public improvement for the State, may have a lien for the value thereof on the money *** due or about to become due the contractor *** by giving *to the Director or other official, whose duty it is to let such contract,* written notice of his claim for lien containing a sworn statement of the claim showing with particularity the several items and the amount claimed to be due on each. The claimant shall furnish a copy of said notice at once to the contractor. The person claiming such lien may cause such written notice with sworn statement of claim to be given either by sending such notice (by registered or certified mail, return receipt requested, with delivery limited to addressee only) to, or by delivering such notice *to the Director or other official of the State whose duty it is to let such contract*; and the copy of such notice *** may be sent *** or delivered to such contractor in like manner. *** The person so claiming a lien *shall, within 90 days after giving such notice, commence proceedings by complaint for an accounting,* making the contractor having a contract with the State and the contractor to whom such material, apparatus, fixtures, machinery or labor was furnished, parties defendant, and shall, within the same period notify the Director *** by delivering to him a copy of the complaint filed ***. *Failure to commence proceedings within 90 days after giving notice of lien pursuant to this subsection shall terminate the lien and no subsequent notice of lien may be given for the same claim nor may that claim be as-*

*serted in any proceedings pursuant to this Act.* It shall be the duty of the Director, upon receipt of the written notice with sworn statement as herein provided, to withhold payment of a sum sufficient to pay the amount of such claim, for the period limited for the filing of suit \*\*\*. Upon the expiration of this period the money \*\*\* so withheld shall be released for payment to the contractor unless the person claiming the lien shall have instituted proceedings and delivered to the Director a copy of the complaint as herein provided, in which case, the amount claimed shall be withheld until final adjudication of the suit is had." (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 82, par. 23(c).)

Additionally, section 23(a) states as follows:

"For the purpose of this Section *'contractor' includes any sub-contractor*; 'State' includes any department, board or commission thereof \*\*\*; and 'director' includes any chairman or president of any State department, board or commission, or the president or chief executive officer or such other person financing and constructing a public improvement for the benefit of the State." (Emphasis added.) Ill. Rev. Stat. 1985, ch. 82, par. 23(a).

The record reveals that Aluma, on September 12, 1986, sent a "Notice of Claim for Lien on Public Funds and on Bond" (the September 12 notice) by certified mail, return receipt requested, to each of the following: Fred Garcia, director of physical plant, University of Illinois, Chicago; Robert Conte, project manager, University of Illinois, Chicago; attorney Diane Sagner, University of Illinois counsel's office, Chicago; Capitol Development Board, Stratton Office Building, Springfield, Illinois; Frederick Quinn Corporation; Conform Erectors; Dew Construction; and "Fireman's [*sic*] Fund Insurance Company, Parsicppany, New Jersey." The notice included a sworn statement that Aluma was owed the sum of $19,422.47 for providing to Conform "certain rental equipment" for the Project, plus interest and attorney fees. However, it is undisputed that Gary Skoien, Executive Director of the State of Illinois Capitol Development Board, was in fact the "Director or other official \*\*\* whose duty it [was] to let the contract" entered into by the CDB and Quinn. It is also undisputed that no copy of Aluma's September 12 notice was ever sent, delivered, or addressed specifically to Gary Skoien, or to the "executive director" of the CDB.

Also contained in the record on appeal is a letter dated September 9, 1986, and signed by Aluma's attorney. The letter is addressed to Fred Garcia, director of physical plant, University of Illinois, Chicago.

It requests from Garcia a copy of the bond posted on Quinn's contract for the Project, and further asks Garcia to "advise as to the name, address and title of the State of Illinois official responsible for letting the contracts and [sic] thus should receive service of the Contractor's Claim for Lien on Public Funds." Plaintiff's attorney stated, in other court documents of record, that he received no response to this this letter. He further stated that his initial information from Aluma indicated that the Project was a University of Illinois at Chicago job; that upon personal investigation, he was advised by the university attorney's office and two other university employees that it was a university job and was given "the name of the person who supposedly let the contract in behalf of the University." He then sent the letter to Garcia and filed the notice of lien claim three days later.

On October 27, 1986, Aluma sent its "Second Notice of Claim for Lien on Public Funds and on Bond" (the October 27 notice), by certified mail, return receipt requested, to the same addressees who were sent the September 12 notice, with two changes. Attorney Brian Higgins was substituted for attorney Diane Sagner at the University of Illinois counsel's office, and "Kenneth E. Delford, Office for Capitol Programs, University of Illinois, Chicago, Illinois," was also notified. The October 27 notice included the same sworn statement as the previous notice, except that the sum owed to Aluma in rental fees was stated to be $20,953.78.

On November 6, 1986, Aluma filed an action in the circuit court of Cook County, chancery division (hereafter the first lawsuit). Aluma's complaint, entitled "Complaint to Foreclose Public Lien," named Quinn, Dew, Conform and the "University of Illinois at Chicago, a subdivision of the State of Illinois," as defendants. The complaint contained the following allegations: (1) that Aluma was a corporation "engaged in the business of providing aluminum beam and related construction material and equipment"; (2) that the University of Illinois at Chicago entered into a contract with Quinn for the construction of the Project, and that plaintiff did not have a copy of that contract; (3) that Quinn had subcontracted a portion of its work to Dew, which in turn had subcontracted a portion of its work to Conform; (4) that on September 9, 1985, Aluma entered into a "subcontract agreement" to rent certain materials to Conform and had performed every condition of that agreement; (5) that all of the material was "accepted and incorporated into the [Project] premises *** or used on said job"; and (6) that on August 15, 1986, "the last date of delivery and work," the sum of $20,953.78 became due and remained due and unpaid. The complaint further stated that "on September 12, 1986 and on October

27, 1986, Plaintiff notified [the] University of Illinois at Chicago of the abovementioned sums due to the Plaintiff for materials furnished and of its Claim for Lien *** upon the money due to Quinn" by certified mail, return receipt requested, and that "it thereupon became the duty of the University *** to withhold sufficient money to pay the amount due to Plaintiff." Aluma requested from the court an accounting to determine the amount due; an order declaring Aluma to have a lien on the sums due and "now in the possession of the University," and an order directing the university to pay Aluma the amount found to be due, with interest and costs.

Attached to Aluma's complaint in the first lawsuit was a copy of its contract with Conform and copies of the September 12 and October 27 notices of lien claim. The two-page agreement between Conform, "as lessee," and Aluma specifically states that plaintiff thereby agreed to supply to Conform certain "Aluma and Hi-Load equipment" for the "Clarence Dew/Bio-Tech/Chicago Technology Park" project for a three-month period beginning September 17, 1985, at a certain discount rental fee, and that an interest charge of 1.5% would be charged on overdue payments. The second page of the contract consists of a "quantity breakdown sheet" stating the various types and amounts of equipment rented, and its total monthly rental value.

It is apparent from other documents of record that sometime prior to December 8, 1986, the university filed a motion to dismiss Aluma's complaint. Plaintiff's attorney has stated in the record and at oral argument before this court that he first discovered that the Project was a CDB project at this time, and "immediately" endeavored to serve the correct public official. On December 8, 1986, Aluma sent a notice, titled "Corrected Notice of Claim for Lien on Public Funds and on Bond" (the December 8 notice), with sworn statement, by certified mail, return receipt requested, to each of the following: Gary Skoien, Executive Director, State of Illinois Capitol Development Board, Stratton Office Building, Springfield, Illinois; Charles Stevenson, Project Manager, State of Illinois Center, Chicago, Illinois; Quinn; Dew; Conform; and "Fireman's [sic] Fund Insurance Company, Parsicppany, New Jersey." The sworn statement, including the sum of money claimed, was identical to that of the October 27 notice.

On January 9, 1987, Aluma sent another notice, labeled "Second Corrected Notice of Claim for Lien on Public Funds and on Bond" (the January 9 notice), also by certified mail, return receipt requested, and containing the same sworn statement, to the following: Gary Skoien; Charles Stevenson; Quinn; Dew; Conform; and "Fireman's

[*sic*] Insurance Company of Newark New Jersey \*\*\*, New York, New York 10038."

Subsequently, plaintiff moved to voluntarily dismiss the first lawsuit. On January 26, 1987, the same day as its motion was granted, it filed the suit which is the subject of this appeal (hereafter, the second lawsuit). Count I of Aluma's "Complaint to Foreclose Public Lien and Other Relief" contained essentially the same allegations as its complaint in the first lawsuit. However, the "State of Illinois through its agency the Capitol Development Board" was named as a defendant, along with Quinn, Dew and Conform, and plaintiff alleged that the CDB, instead of the university, had entered into the contract with Quinn. Plaintiff further stated, in count I, that it had notified the CDB and all the officials therein listed by a notice served by certified mail "on December 12, 1986" (the notice dated December 8), a copy of which was attached to the complaint. Count I did not mention the January 9 notice. It requested that the court take an accounting, that Aluma be decreed to have a lien, and that the CDB be ordered to pay to Aluma the amount due.

Count II, naming Firemen's (incorrectly sued as "Fireman's Fund") as an additional defendant, asserted a claim based on the payment bond, pursuant to the Bond Act. It stated that within 180 days of the last date upon which material was furnished by Aluma, a notice of claim under the contractor's bond was given to the CDB, with copies sent to Quinn and Firemen's. The January 9 notice, as exhibit IV, was attached to the complaint in support of these allegations. Also attached to the complaint were copies of Aluma's contract with Conform and Quinn's contract with the CDB, including the performance and payment bonds which formed an integral part of that agreement.

Quinn filed its motion to dismiss on February 25, 1987, asserting that plaintiff's claim against it was barred by affirmative matter avoiding the legal effect of the claim, pursuant to section 2—619 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—619(a)(9)). In support of its motion, Quinn pointed to the allegation in Aluma's complaint that it gave notice of its lien to the public body on December 12, 1986. Quinn contrasted this statement with the allegation in Aluma's earlier complaint, in the first lawsuit, that Aluma's claim for lien was served on the university on September 12, 1986, and noted that the September 12 notice was also served on the CDB. Quinn argued that pursuant to the express requirements of section 23, plaintiff was to have commenced its action prior to December 12, 1986, in order to meet the 90-day filing limitation, and that, furthermore, the statute provides that "no subsequent notice of lien may be

given." Thus, Quinn contended that Aluma's November 6, 1986, complaint, which Quinn attached to its motion, constituted affirmative matter barring the instant claim, which was based upon a purported lien which Aluma, by not adhering to the statute's procedural requirements, had never perfected.

Also on February 25, 1987, Firemen's moved to dismiss the claim asserted against it in count II. Firemen's contended that count II was deficient in two respects. First, while the payment bond specifically defined a "claimant" under the bond as "any person, firm or corporation having contracts with Principal [Quinn] or with Principal's subcontractor [Dew] for labor or materials," Aluma had alleged only that it had contracted with Conform. Second, Aluma had not supplied "labor or materials," but instead had only "rented certain equipment." Citing Illinois case law in support of the premise that a surety on a payment bond is not liable beyond the express terms of its undertaking, which terms in this case did not include either material suppliers of sub-subcontractors or suppliers of rental equipment, Firemen's argued that Aluma was not entitled to relief under the bond.

Plaintiff filed written memoranda in opposition to both motions to dismiss. With respect to Quinn's motion, plaintiff argued that only the public body, and not the general contractor, has standing to seek a dismissal based on an alleged defect in a notice of lien under section 23. It further contended that the September 12 and October 27 notices should be considered nullities, since they were not served on the proper State official named in the statute, and that because the instant case was filed within 90 days of the December 8 "valid" notice, it was commenced within the requisite statutory period and should not be dismissed. With respect to Firemen's motion to dismiss its claim under the Bond Act, Aluma argued that it fell within the express language of the statute defining those who were entitled to assert claims, and that the legislature had not intended to exclude persons in its position from recovery.

On May 26, 1987, the trial court heard arguments on the motions to dismiss. Counsel for Quinn and Firemen's maintained that Aluma was trying to circumvent the express language of section 23, which prohibits subsequent notices for the same claim, by claiming that its first two notices were "invalid" and that the period for commencing its lawsuit should run from the time of its "valid" notice of December 8. In its order granting Quinn's motion, the court found that "plaintiff's notices of lien *** dated September 12, 1986, October 27, 1986, and December 12, 1986 as served by Aluma are null and void." The court's order further stated that it did not need to consider the argu-

ments related to Firemen's motion in order to dismiss the entire action, because "the granting of Quinn's [m]otion *** disposes of Firemen's [m]otion."

Aluma moved for reconsideration of the court's May 26, 1987, order. At the hearing on Aluma's motions to reconsider, defendants' counsel agreed with Aluma's position that the two motions to dismiss should have been considered separately. Both sides were permitted to reargue the merits of Firemen's motion, whereupon the trial judge found that Firemen's motion should be granted on "grounds as reenunciated." In an order dated September 16, 1987, the trial court denied plaintiff's motions to reconsider, granted Firemen's motion to dismiss, and found that there was no just reason to delay enforcement or appeal.

On appeal, Aluma presents the following issues for our review: (1) whether the trial court erred in granting Quinn's motion to dismiss its mechanics' lien claim (a) because Quinn, as general contractor, had no standing to challenge the sufficiency of its notice to the public body; or (b) because Aluma's December 8 notice satisfied the statutory requirements, and, as the first "valid" notice, allowed 90 days from December 8, 1986, in which to commence an action for an accounting and thus perfect the lien; or (c) because the spirit and intent of section 23 were not violated by successive notices where the previous notices were served on incorrect officials in good faith and the correct official was subsequently notified and a suit commenced within 90 days thereof; or (d) alternatively, assuming that this court finds its September 12 notice to be legally valid for purposes of section 23, because Aluma extended by one year the time period for filing its second lawsuit, by virtue of the involuntary dismissal of its first lawsuit, pursuant to provisions of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 13—217); and (2) whether the trial court improperly granted Firemen's motion to dismiss count II of Aluma's complaint because Aluma was an intended claimant under the provisions of the Bond Act and the payment bond posted by Quinn.

OPINION

We observe at the outset that counts I and II of plaintiff's complaint are separate and independent claims under different statutes. Consequently, Quinn's motion, challenging the mechanics' lien claim, and Firemen's motion, challenging the Bond Act claim, require separate analysis and determination.

■ We first address the trial court's order granting Quinn's section 2—619 motion to dismiss Aluma's public mechanics' lien claim.

As a preliminary matter, we find no merit in plaintiff's contention that Quinn is challenging the validity of its September 12 notice based on service to the incorrect public official, and that only the public body has standing to seek dismissal on that ground. Aluma relies on *Chicago Wood Piling Co. v. Anderson* (1942), 313 Ill. App. 242, 39 N.E.2d 702, a section 23 case in which the court held that the original contractor was not in a position to question the sufficiency of notice given to the county by a subcontractor's supplier, citing prior case law for the premise that the question of whether notice is served on the proper official can be raised only by the party upon which notice must be served. (*Chicago Wood Piling Co.*, 313 Ill. App. at 247-48, 39 N.E.2d at 704-05.) While contrary authority may also be cited (*Pirola v. W.J. Turnes Co.* (1909), 238 Ill. 210, 87 N.E. 354; *Edwin Pratt's Sons' Co. v. Schafer* (1937), 290 Ill. App. 80, 7 N.E.2d 901), we need not resolve the issue of standing because Quinn's motion to dismiss does not challenge the sufficiency or validity of the September 12 or October 27 notices, based on service to an incorrect official or any other defect. Quinn's motion alleges that Aluma, by filing successive notices for the same claim, and by filing the instant lawsuit more than 90 days after its first notice, failed to comply with the prescribed statutory procedure for perfecting a lien upon which a cause of action could be based. Certainly Quinn, as a defendant in the case, can assert as grounds for dismissal the plaintiff's failure to perfect the purported lien upon which its claim rests.

Illinois case law on public mechanics' liens is not extensive. Issues relating to the procedural requirements, particularly, have not been well litigated and are not settled. (See generally Finch, *A Primer on Illinois Mechanics' Liens*, 75 Ill. Bar J. 500 (1987).) However, certain established principles must guide our analysis of the issues. Mechanics' liens, public or private, are wholly a creation of statute; no comparable right or remedy was recognized at common law or in equity. This fact has given rise to the well-settled rule that the Mechanics' Liens Act must be strictly construed with reference to all requirements upon which the right to a lien depends. (*North Side Sash & Door Co. v. Hecht* (1920), 295 Ill. 515, 129 N.E. 173; *Joseph N. Eisendrath Co. v. Gebhardt* (1906), 222 Ill. 113, 78 N.E. 22; *Mixer v. Billingsley* (1982), 110 Ill. App. 3d 239, 442 N.E.2d 275.) Courts have specifically applied this general rule to liens on funds for public improvements under section 23. (See, *e.g.*, *Alexander Lumber Co. v. Coberg* (1934), 356 Ill. 49, 190 N.E. 99; *Gunther v. O'Brien Brothers Construction Co.* (1937), 293 Ill. App. 28, 12 N.E.2d 23, *rev'd on other grounds* (1938), 369 Ill. 362, 16 N.E.2d 890.) The burden of

proving that each requisite has been satisfied is on the party seeking to enforce the lien. (*Edward Electric Co. v. Automation, Inc.* (1988), 164 Ill. App. 3d 547, 549, 518 N.E.2d 172, 174.) Furthermore, it has been stated that a mechanics' lien "should be enforced when the party brings himself within the provisions of the statute, but it should not be extended to cases not provided for by the language of the act even though they may fall within its reason." *Alexander Lumber Co. v. Coberg* (1934), 356 Ill. 49, 53, 190 N.E. 99, 101; *Hoier v. Kaplan* (1924), 313 Ill. 448, 451, 145 N.E. 234, 244.

The above-stated rules of strict construction are followed by the courts despite the equitable nature of mechanics' liens procedures and despite section 39 of the Act, which states, "This act is and shall be liberally construed as a remedial act." (Ill. Rev. Stat. 1985, ch. 82, par. 39.) Thus, the effect of section 39 has not been to broaden the class of claimants to which the right of lien extends or to substantially ameliorate the necessity for strict procedural compliance in order to perfect a lien. While our supreme court has declined to establish filing requirements other than those expressly provided in the Act, not wishing to render validly perfected liens technically unenforceable, it remains the settled rule that "[t]he lien is valid only if each of the statutory requirements is scrupulously observed." (*First Federal Savings & Loan Association v. Connelly* (1983), 97 Ill. 2d 242, 246, 454 N.E.2d 314, 316.) Once a proper lien claimant has "strictly complied with each of the statutory requirements, he has a right to expect that his lien will be completely enforceable." (*Connelly*, 97 Ill. 2d at 251, 454 N.E.2d at 319.) As one commentator has succinctly stated:

> "The effect of [section] 39, therefore, is to liberalize the court proceedings necessary to enforce the right of lien created by the [Mechanics' Liens] Act. To obtain that right, however, one must comply strictly with the Act. It is this rule of strict construction which is chiefly responsible for the somewhat technical interpretation of the Act by the courts and for the difficulty often involved in exercising the rights created by it." Simon, *Nature, Origin, & Classes of Mechanics' Liens*, in Illinois Mechanics' Liens ch. 1, §1.9 (Ill. Inst. for Cont. Legal Educ. 1986).

However, notwithstanding the strict construction generally given to all sections of the Mechanics' Liens Act, there is authority which favors some flexibility in applying the general rules, so that the statute's provisions are not construed so technically that its remedial purpose is undermined and all but lost in the process. For example, *United Cork Cos. v. Volland* (1937), 365 Ill. 564, 7 N.E.2d 301, involved a complaint which alleged an incorrect completion date for the

subcontractor's work on a private construction project. The completion date as alleged occurred two months before the claim was filed, while evidence showed that the final work was actually done several months after the filing of the claim, although plaintiff was requesting no payment for the work done subsequent to the filing. Our supreme court reversed the appellate court decision overturning the subcontractor's recovery in the trial court, based on this technical variance, and further stated:

> "The doctrine of strict construction was never meant to be applied as a pitfall to the unwary, in good faith pursuing the path marked by the statute, nor as an ambuscade from which an adversary can overwhelm him for an immaterial misstep. Its function is to preserve the substantial rights of those against whom the remedy offered by the statute is directed, and it is never employed otherwise." (*United Cork*, 365 Ill. at 572, 7 N.E.2d at 305.)

(See also *First Federal Savings & Loan Association v. Connelly* (1983), 97 Ill. 2d 242, 251, 454 N.E.2d 314, 319.) Moreover, in an early appellate decision, the court was required to apply the original language of section 23, which limited lien claimants to those furnishing materials to "any contractor," excluding subcontractors, and yet upheld the lien of a supplier who had received an oral promise of payment by the contractor, but who delivered the materials to a subcontractor in reliance on the contractor's promise. The court concluded:

> "While it has been said by the Supreme Court that this statute [is] in derogation of the common law and should be strictly construed, yet we do not believe that such a construction should be adopted as to deprive one of a remedy for the materials furnished and used in the. erection of the building, if the proper notices have been given ***. The object and purpose of the lien law is to protect those who in good faith furnish materials for the construction of buildings, and such persons ought not by a strict construction to be deprived of this remedy." *Granite City Lime & Cement Co. v. Board of Education of School District No. 126* (1916), 203 Ill. App. 134, 140.

■ Mechanics' liens have a long history in Illinois, dating back to the first mechanics' lien statute in 1825, which created a contractor's lien on private real estate. (1825 Ill. Laws 101; S. Love, Illinois Mechanics' Liens 2 (2d ed. 1950).) In 1863 and 1869, statutes were enacted providing for subcontractors' liens (1863 Ill. Laws 57; 1869 Ill. Laws 255). With the passage of the Mechanics' Liens Act of 1895, a lien for labor performed and materials supplied to public improve-

ments projects for the State, municipalities, and other governmental bodies became part of Illinois law. (1895 Ill. Laws 226.) In 1903, a new mechanics' lien statute superseded all prior enactments. (1903 Ill. Laws 230.) The Mechanics' Liens Act of 1903, as amended, remains in force to the present day. The only section of the Act which pertains to liens on funds for public improvements (public mechanics' liens) is the current section 23, and it is a matter of settled law that only section 23 governs the preservation and enforcement of liens on public funds. (*Alexander Lumber Co. v. Coberg* (1934), 356 Ill. 49, 54, 190 N.E. 99, 101; *Anderson "Safeway" Guard Rail Corp. v. Champaign Asphalt Co.* (1971), 131 Ill. App. 2d 924, 929, 266 N.E.2d 414, 418; see also S. Love, Illinois Mechanics' Liens 425 (2d ed. 1950).) This is a reasonable rule, as the lien created by section 23 is materially different from all other liens established under the Act. A public mechanics' lien is available only to subcontractors, as it is a lien upon the funds awaited by, and due to, the original contractor. More significantly, it is a lien on the fund set aside for the public improvement, rather than upon the land where the building is located. 7A C. Nichols, Illinois Civil Practice, §7577, at 420.

Section 23 has been amended on numerous occasions since 1903, most often to implement changes in the technical notice and filing procedures and to gradually extend the limitation period for commencing suit from the original 30 days (1919 Ill. Laws 642), to the current 90 days after the filing of the lien claim notice. A 1935 amendment also extended the right of lien to sub-subcontractors and suppliers to subcontractors, where previously a lien had been available only to the general contractor's immediate subcontractor. (1935 Ill. Laws 950.) In order to resolve the issues presented, we will first need to focus on a 1979 amendment to section 23 which extended the period for commencing suit to its current 90 days, and added the language pertaining to a termination of the lien for failure to comply with the limitation period. The amendment also prohibited filing subsequent notices of lien for the same claim. Public Act 81—794, eff. Jan. 1, 1980 (amending Ill. Rev. Stat. 1979, ch. 82, par. 23).

■ The applicable rules of statutory construction were well articulated in *Koenig v. McCarthy Construction Co.* (1951), 344 Ill. App. 93, 100 N.E.2d 338. In interpreting the language used in a statute,

> "the primary aim is to ascertain the legislative intent [citation], *which may be discerned from the history of the legislation or from the use of the terms in other sections of the same or other Illinois statutes.* [Citation.] This approach must precede any analogy to interpretations of allegedly similar statutes

by courts of other jurisdictions." (Emphasis added.) (*Koenig*, 344 Ill. App. at 97, 100 N.E.2d at 340.)

It has been further noted that the dissimilarity of the various mechanics' lien statutes makes judicial decisions based on the statutes of other States of little use in the construction of ours. (*Hoier v. Kaplan* (1924), 313 Ill. 448, 455, 145 N.E. 243, 245; *Provost v. Shirk* (1906), 223 Ill. 468, 475-76, 79 N.E. 178, 180-81.) Of course, the reviewing court's determination of the legislative intent must always begin with the statutory language itself. As our supreme court has recently reiterated, the express language of an enactment is the best indication of the intent of the drafters, and that language should be examined, and given its plain and ordinary meaning, before resort is made to other interpretive aids. *Henry v. St. John's Hospital* (1990), 138 Ill. 2d 533, 541.

Plaintiff, by any one of several arguments, urges us to find that, despite technical noncompliance, it has not violated the spirit and intent of section 23's procedural requirements in attempting to perfect a lien. It maintains that it is a proper lien claimant protected by the statute, and that under the particular circumstances here presented, it should not be deprived of an opportunity to establish its claim. For the reasons set forth below, we agree.

■ At the outset, we observe that there has been no suggestion by any party that plaintiff acted with anything but good faith in prosecuting its claim. Plaintiff contends, as it did in the circuit court, that it made its first effort to notify the correct public official after receiving incorrect and misleading information from several sources. Later, upon discovering its error, it acted promptly to notify the director whose duty it was to let the contract in question. At that point, plaintiff apparently believed that the most prudent course of action was to seek a voluntary dismissal of its first lawsuit and immediately file a new complaint, relying on its "valid" December 8 notice. Aluma feared that after it moved to amend its complaint, which would then relate back to the date of its original complaint (*i.e.*, November 6, 1986) for the purpose of determining whether it was time barred, the court would deem its suit "premature," because its first "valid" notice, to the correct official, had been sent after, not before, the date of its complaint for an accounting. By the express terms of section 23, the lien claim notice is a prerequisite for filing suit based upon the claim. Aluma therefore determined to commence an action that would unambiguously "follow" the requisite "valid" notice.

There are few reported cases dealing with the statutory notice provisions of section 23 as they relate to a misdirected notice or to

the notification of an incorrect public official. While it is clear that the circuit court has jurisdiction over the subject matter of the claim, even if the lien notice is, for some reason, not valid (*People ex rel. Anderson v. Village of Bradley* (1937), 367 Ill. 301, 304-05, 11 N.E.2d 415, 418; *A.J. Davinroy Plumbing & Heating v. Finis P. Ernest, Inc.* (1980), 87 Ill. App. 3d 1047, 1052, 409 N.E.2d 372, 376), the law is unsettled as to the effect of procedural defects upon a plaintiff's attempt to perfect a lien.

In *Wilbur Waggoner Equipment Rental & Excavating Co. v. Johnson* (1975), 33 Ill. App. 3d 358, 342 N.E.2d 266, plaintiff furnished material and equipment for the demolition of a public high school and then attempted to claim a lien on the money due the original contractor. When defendants, officials of the school district, failed to withhold the money from the contractor, Waggoner sued the officials, in their individual capacities, for breach of their duty under section 23. The appellate court found that Waggoner was "in neither literal nor substantial compliance with th[e] statute," as it had sent its lien claim notice to the "Board of Education of District 189," attention of "Miss Carol Frye," who apparently had no connection with the defendants, rather than directly to the defendants, business manager and superintendent, respectively, of "School District No. 189." Furthermore, plaintiff had failed to commence a lawsuit within the then required 60 days of notice. (*Waggoner*, 33 Ill. App. 3d at 362, 342 N.E.2d at 269-70.) Accordingly, the trial court had properly dismissed the damage claim against the two officials, because, "in view of the failure of plaintiff to follow the procedure provided in section 23 no duty devolve[d] upon the officials charged." (*Waggoner*, 33 Ill. App. 3d at 363, 342 N.E.2d at 270.) While *Waggoner* differs in important respects from the case at bar, particularly in that Waggoner never filed a lawsuit within the required time period after its "insufficient" notice, it does at least suggest that "substantial compliance" with the section 23 notice provisions might be held sufficient under different facts. *Waggoner*, 33 Ill. App. 3d at 361-62, 342 N.E.2d at 269.

Another case raising an issue of substantial compliance is *A.J. Davinroy Plumbing & Heating v. Finis P. Ernest, Inc.* (1980), 87 Ill. App. 3d 1047, 409 N.E.2d 372. In *Davinroy*, plaintiff mailed its notice of lien to the county housing authority's attorney, among others, but not to the housing authority's chairman and executive director, who were the officials authorized to disburse funds under the relevant contract. Plaintiff urged the court to rule in its favor because of its "substantial compliance" with section 23. The court declined, based not only upon the defective notice, but also upon plaintiff's failure to file

its suit within the prescribed time and its failure to serve a copy of the complaint for that suit upon the correct official. As the court concluded, "it [could] not be said that plaintiff *** substantially complied with the act." (*Davinroy*, 87 Ill. App. 3d at 1053, 409 N.E.2d at 376.) Five months later, another appellate panel held that the mechanics' lien claim of a material supplier for a public school construction project should not have been dismissed. (*O.E. Schrock, Inc. v. Blue Mound Community Unit School District No. 10* (1981), 92 Ill. App. 3d 1138, 1140, 416 N.E.2d 732, 734.) The only defect in Schrock's compliance with statutory procedure was that the copy of its complaint, timely served upon, and admittedly received by, the correct school board official, was not certified. The court stated that this one technical error, in what was otherwise perfect compliance with section 23, would not invalidate plaintiff's claim. *Schrock*, 92 Ill. App. 3d at 1139, 416 N.E.2d at 733.

While the above-cited cases are useful, in that they illustrate the willingness of reviewing courts to at least consider the "substantial compliance" argument when deciding notice and filing questions, the older case of *Edwin Pratt's Sons' Co. v. Schafer* (1937), 290 Ill. App. 80, 7 N.E.2d 901, most closely parallels the case at bar on its facts. The defendants in *Pratt* contended, *inter alia*, that plaintiff had lost its lien because it had initially filed a notice on March 28, 1929, with the Illinois Director of Purchases and Construction, and other officials, rather than with the Director of Finance, as then required by section 23. Plaintiff subsequently filed another notice, on May 2, 1929, with the correct State officials, and then filed suit on May 15, 1929, within the then applicable 30-day limitation period as measured from the second notice. It had never commenced an action within 30 days of its first, defective notice. The court, holding that the plaintiff had not lost its lien under these facts, concluded:

> "The lien was not enforceable unless the sworn statement was filed with the officials named in the section. (*Pirola v. Turnes Co.*, 238 Ill. 210.) The sworn statement, or claim for lien, in the present case not having been filed with the officials named in the section, was irregular and defective. In cases of this kind, where the claim for lien is defective and not sufficient in law, the lien claimant is entitled to fix and attach his lien by filing a second claim for lien. *Berger Mfg. Co. v. New York*, 206 N.Y. 24, 99 N.E. 153. (See, also, 40 C. J. 177.)" *Pratt*, 290 Ill. App. at 87, 7 N.E.2d at 904.

Although the approach taken by the *Pratt* court seem inherently practical and fair, we observe that *Pratt* was announced at a time

when neither section 23 nor the analogous New York statute set any limit on the number of notices a lien claimant could file for the same claim. In 1979, the Illinois legislature amended section 23 to prohibit successive notices, while at the same time extending the limitation period for commencing suit to 90 days following the notice date. The legislative history of the amendment reveals that Public Act 81—794, which incorporated the changes into section 23, began as Senate Bill 1140, sponsored by Senator Walsh. (Pub. Act 81—794, eff. Jan. 1, 1980.) As originally introduced, the bill would have provided for the termination of any lien for which no suit was commenced within the limitation period, but would have retained the 60-day limitation period then in effect. (81st Ill. Gen. Assem., Senate Proceedings, May 22, 1979, at 155.) However, the House committee to which the bill was assigned adopted an amendment to the bill, after consultation with construction industry representatives and other interested parties, which essentially became the final version of Public Act 81—794. As enacted, the amendatory legislation, *inter alia*, extended the limitation period from 60 to 90 days following the lien claim notice, and inserted the express language providing that "[f]ailure to commence proceedings within 90 days after filing a notice of lien pursuant to this paragraph shall terminate the lien and no subsequent notice of lien may be filed for the same claim nor may that claim be asserted in any proceedings pursuant to this Act." Ill. Rev. Stat. 1979, ch. 82, par. 23.

From the legislative history we may discern some general objectives behind the new language of section 23. Senator Walsh explained that the provision for forfeiture of the lien if a suit was not commenced within the limitation period was inserted for the purpose of adding a "sanction" for failure to file a timely lawsuit, as opposed to simply stating the limitation period. (81st Ill. Gen. Assem., Senate Proceedings, May 22, 1979, at 155.) The bill's House sponsor, Representative Daniels, stated that with a 90-day limitation period, there was a "greater possibility that settlements [might] be reached without the necessity for court action." 81st Ill. Gen. Assem., House Proceedings, June 19, 1979, at 135.

The most extensive discussion of Senate Bill 1140 occurred on June 13, 1979, when the House Judiciary I Committee heard testimony from construction industry spokesmen and entertained questions from legislators, before voting to adopt the amendment to the original bill. At this time, Robert Maher, representing an organization comprising a large segment of the Illinois construction industry, testified as a proponent of the bill at the request of Representative Dan-

iels. Maher explained that the changes in section 23 had been drafted with input from many interested parties, including contractor and subcontractor groups, insurance industry groups, and State agencies. He further stated that those involved believed that there was a need to clarify the language in the Act regarding the forfeiture of liens on public funds for failure to file suit within the time prescribed. The clarification was necessary, according to Maher, because a practice had developed in Illinois, over the years, despite the express 60-day limitation period, whereby subcontractors would, for example, file a notice of lien, then "wait 55 days," then file "a successive notice," then wait another 55 days and file another notice, all for the same claim. This practice would both tie up public funds and "circumvent the intent of the General Assembly and the law" that in order to enforce a public mechanics' lien, one must file a lawsuit within the prescribed time. In Maher's words, he believed that, in order to "protect the public body," it was necessary to "clean up these contracts." (81st Ill. Gen. Assem., House Proceedings, June 13, 1979, Judiciary I Committee (taped debate on Senate Bill 1140).) While the above comments and testimony shed some light on the legislative intent behind the amendment, our research has uncovered no discussion or debate specifically focusing on the language which forbids "subsequent notice of lien *** for the same claim." This is the language upon which Quinn's motion to dismiss essentially relies.

■ The procedure followed by Aluma must be viewed in light of the express language of section 23, the legislative intent in amending the statute in 1979, and the applicable legal rules. With respect to the September 12 notice, we believe that the facts as presented support a ruling in favor of Aluma's substantial compliance with the statute and the validity of that notice under section 23. Notice to the Capitol Development Board, generally, did not in itself constitute compliance with the requirement of giving notice to the correct public official, *i.e.*, its Executive Director, Gary Skoien. He was not notified until December 8. However, this court was informed at oral argument that Project Manager Robert Conte, who was sent the September 12 notice, apparently had duties directly related to the letting and execution of the contract. Furthermore, none of the parties have alleged that the State did not receive actual notice on or about September 12, 1986, or did not withhold the requested funds on the basis of that notice. While plaintiff would have been wise to pursue further its inquiries concerning the identity of the public official whose duty it was to let the contract, the fact remains that Aluma made numerous good-faith efforts to serve notice on the correct public official, while at the

same time directing notice of its claim to individual State employees at the university who undisputedly had some connection with the management of the project or the Quinn contract, as well as to the Capitol Development Board, generally.

Equally important, Aluma filed a complaint for an accounting well within 90 days of its first notice. By December 8, still within 90 days of its September 12 notice, all of the correct persons had been sent proper notice of the claim. At this time, plaintiff had an action for an accounting filed and pending in the circuit court. In retrospect, we might question plaintiff's decision to request an involuntary dismissal in order to file a new complaint, naming the CDB as defendant and relying on what it believed would be an unquestionably "valid" notice of lien claim, but we can certainly understand the confusion which could arise in such a situation. Forfeiture of the lien for filing suit "prematurely" and failure to serve Gary Skoein with a copy of the November 6 complaint were both of concern. Having considered all of these factual circumstances, and the equitable concerns of justice and fundamental fairness, we hold that plaintiff's September 12 notice substantially complied with the statutory requirements, so as not to result in forfeiture of its purported lien for reasons of defective service or otherwise, and that the September 12 notice constituted a valid lien claim notice pursuant to section 23.

It is, however, the sending of successive notices, and not any defect in plaintiff's first notice, which is the substance of Quinn's objection to the claim and the basis for its motion to dismiss. We can glean from the legislative history that the objective of the express "forfeiture" and "subsequent notice" language added to section 23 was essentially to eliminate the tying up of public monies, for more time than reasonably necessary, based solely upon the unverified and unadjudicated claim notices of subcontractors. While subcontractors were still permitted to file the notice for a particular claim at any time, as long as funds remained in the hands of the State, and while they were given an additional 30 days to conduct negotiations and get to the courthouse, after the claim was filed, they were limited to one notice per claim. This would ensure that any necessary litigation would commence promptly and be completed within a reasonable time, and that an individual subcontractor, by filing successive claims for large sums of money, could not exert unwarranted leverage on other parties while causing *de facto* extension of the 90-day filing period.

We do not believe that any of these objectives were undermined by Aluma's attempts to comply with statutory procedure. While we acknowledge that the statutory provision could be read as imposing

an absolute ban on notices subsequent to the first, even if sent only for purposes of correction, and even if the only suit ever brought on the claim was filed within 90 days of the first notice and in reliance thereon, we find the language to be somewhat ambiguous in the context of the entire sentence, "Failure to commence proceedings *within 90 days after giving notice* of lien pursuant to this subsection shall terminate the lien and no subsequent notices of lien may be given for the same claim nor may that claim be asserted in any proceedings pursuant to this Act." (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 82, par. 23(c).) As previously noted, we were unable to find any legislative history to aid in the interpretation of the "subsequent notice" provision, except for the brief testimony of a nonlegislator proponent, focusing on the overall objective of eliminating practices which undercut the legislative intent in establishing a strictly limited filing period. While the express language of this provision is ambiguous, it is evident that Aluma's course of action in prosecuting its claim did not contravene the spirit and objectives of the amendment, as we can best discern them. The statute gives plaintiff, in defendants' words, "one bite at the apple," and that is all it attempted to take. It attempted to pursue one claim for approximately $20,000 in rental fees, with suit for an accounting filed within 90 days of notice of that claim, and with proceedings continuously and actively pursued thereafter. To hold that, under all the intendant circumstances, Aluma forfeited its lien for filing the successive corrected notices would be unduly harsh and inconsistent with the remedial purpose of section 23. We therefore decline to do so.

Nonetheless, we wish to emphasize that our holding is limited to the particular circumstances of the case at bar. We are not suggesting that a lien claimant who files a notice with an incorrect official may later file another notice to correct the situation and then take up to 90 days from the corrected notice to file suit. The possibilities for abuse and confusion which would result from such a ruling are obvious. The intent of the legislature, that one notice be filed per claim, and that claimants who do not file suit within 90 days of that one notice forfeit their lien, seems clear. Beyond that, we are not willing to construe the prohibition against "subsequent" notices so strictly that it precludes recovery by a lien claimant who proceeded in good faith in the manner outlined here, without undermining the spirit of the statute or prejudicing defendants or third parties.

Before proceeding to other issues, we would also observe that section 23 provides no mechanism by which the public body may confidently determine whether a lien claim notice is "valid" or "insuffi-

cient" for the purpose of starting the 90-day limitation period. It appears that, in practice, when the public body receives actual notice of a claim, it withholds the amount claimed, although it may not be under a legal duty to do so where notice was not sent to the correct official. (See *Wilbur Waggoner Equipment Rental & Excavating Co. v. Johnson* (1975), 33 Ill. App. 3d 358, 362, 342 N.E.2d 266, 270.) For this reason, among others, clarification of certain provisions of the notice and filing requirements of section 23 might serve the interests of fairness and efficiency in their practical application. Such concerns, however, are properly addressed by the legislature. In the case at bar, plaintiff will be permitted, on remand, to amend its complaint to allege a valid September 12, 1986, notice of lien claim, and count I of its complaint will be deemed to relate back to the original November 6, 1986, filing date for the purpose of meeting the 90-day filing requirement. In addition, the subsequent service of the complaint upon the correct public official will be deemed effective to comply with the statutory provision requiring service on that official within the 90-day filing period. Finally, although plaintiff's September 12 notice stated that $19,422.47 was unpaid and owing on its rental contract, while its October 27 notice stated for the first time that it was claiming $20,953.78, we do not feel that a limitation of its claim at this point in time would serve any useful purpose, or serve the ends of justice. As it appears that the State has withheld the larger amount to cover Aluma's claim, its complaint may stand as to the amount requested.

Although unnecessary for the disposition of this appeal, we will briefly address Aluma's alternative argument relating to involuntary dismissal under section 13—217 of the Code of Civil Procedure (the Code) (Ill. Rev. Stat. 1985, ch. 110, par. 13—217). Essentially, Aluma contends that, assuming *arguendo* the legal sufficiency of its September 12 notice, it had an absolute right to voluntarily dismiss its first, timely filed lawsuit, and to refile its complaint anytime within a one-year period, pursuant to section 13—217. The statute provides, in relevant part:

> "In the actions specified in Article XIII of this Act or any other act or contract where the time for commencing an action is limited, if *** the action is voluntarily dismissed by the plaintiff, *** the plaintiff *** *may commence a new action within one year or within the remaining period of limitation, whichever is greater*, *** after the action is voluntarily dismissed ***." (Emphasis added.) Ill. Rev. Stat. 1985, ch. 110, par. 13—217.

As plaintiff correctly points out, the Illinois Appellate Court,

Fourth District, held in one case that a subcontractor who took a voluntary nonsuit of his complaint to foreclose a private mechanics' lien under section 21 of the Act could file a new complaint for the same cause of action anytime within one year following the voluntary dismissal order, in reliance on the predecessor provision to section 13–217 of the Code. The court held that the subcontractor could do so despite the fact that the two-year statute of limitations, which applies to private mechanics' lien claims, had already run. (Ill. Rev. Stat. 1979, ch. 82, pars. 7, 9, 21; *LaBarge, Inc. v. Corn Belt Bank* (1981), 101 Ill. App. 3d 741, 744, 428 N.E.2d 711, 713.) *LaBarge* has never been overruled on this point, nor has any appellate decision extended its rationale and holding to a situation involving a section 23 claim. Thus, the question of whether a proper section 23 lien claimant, who strictly complied with all procedural requirements in perfecting a lien, and who timely filed suit within the limitation period, may obtain a voluntary dismissal of the action and then refile the same cause of action anytime within the next year, has not been decided. As we are not required to rule on this issue under the facts of the instant case, we decline to do so. However, we would observe that commencing an action for an accounting within the 90-day limitation period of section 23 is an absolute prerequisite to a right of action under that section, not merely a limitation upon the amount of time allowed to enforce that right. It is also a limitation period which the legislature has been slow to extend, over the course of a century, from the original 30 days to the current 90 days, while taking steps, discussed above, to prevent its *de facto* extension by claimants. These factors will no doubt need to be considered in resolving the apparent conflict between the two statutory provisions.

■ We have held that Aluma's purported lien was not forfeited for reasons of procedural noncompliance. However, this holding can only aid plaintiff's position if Aluma is also within the general category of claimants who are entitled to protection under the statute. Quinn contends that plaintiff is not a proper lien claimant under section 23 because it is a supplier to a subsubcontractor, occupying the fourth tier in the contractual chain from the original contractor. Our research has revealed no Illinois case upholding the lien rights of a fourth-tier claimant. Nor have we located a decision holding that such suppliers, as a matter of law, do not fall within the statute's protection. However, we believe that the case of *Koenig v. McCarthy Construction Co.* (1951), 344 Ill. App. 93, 100 N.E.2d 338, provides ample authority for holding that Aluma's claim is covered by the mechanics' liens statute.

The facts of *Koenig* are substantially similar to those of the instant case in certain aspects. In 1948, the City of Joliet engaged McCarthy Construction Company (McCarthy) as general contractor for the construction of a sewer system. McCarthy contracted with Gomorra & Girot Construction (Gomorra) for the system's precast manhole rings. Gomorra contracted with R.H. Koenig & Son (Koenig), which was to furnish wooden and steel forms for the concrete manhole rings. Koenig delivered the forms to Gomorra, which did not pay Koenig for them. It was stipulated that McCarthy originally had no knowledge of the contract between Koenig and Gomorra, but was served with notices of unpaid claims under the Mechanics' Liens Act. The circuit court ruled that Koenig had a section 23 lien on the funds held by the City of Joliet and due to McCarthy, to the extent of Koenig's unpaid balance, due from Gomorra. On appeal, the defendants argued, on grounds not relevant here, that Gomorra was not in fact a "subcontractor," and that therefore Koenig could not be a supplier to a "subcontractor" and thus entitled to a lien.

In resolving the issues presented, the *Koenig* court was required to interpret the term "subcontractor" as it appears in the Mechanics' Liens Act and to apply that interpretation to the language of the 1935 amendment to section 23, extending lien rights to suppliers of "subcontractors." (1935 Ill. Laws 950.) The specific language at issue, which remains part of the current section 23, declares simply, "For the purpose of this Section 'contractor' includes *any sub-contractor*." (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 82, par. 23(a).) While the 1935 amendment was clearly a reaction to a court decision construing the section as limited to those contracting directly with or supplying the original contractor (see *Alexander Lumber Co. v. Coberg* (1934), 356 Ill. 49, 190 N.E. 99), the amendment did not specifically define the term "sub-contractor" as used in section 23. Moreover, there was, and is, no legislative history which could shed some light on the particular meaning intended by the General Assembly. Accordingly, the *Koenig* court looked to section 21 of the Mechanics' Liens Act, which then stated in relevant part:

> "Every mechanic, workman or other person who shall furnish any materials, apparatus, machinery or fixtures, or furnish or perform services or labor for the contractor, *or shall furnish any material to be employed in the process of construction as a means for assisting in the erection of the building or improvement in what is commonly termed form or form work where concrete*, cement or like material *is used in whole or in part*, shall be known *under this act as a subcontractor* \*\*\*." (Em-

phasis added.) (Ill. Rev. Stat. 1949, ch. 82, par. 21.)
This language, virtually unchanged in the present version, was added
to section 21 and other sections of the Act in 1913. (1913 Ill. Laws
400.) Applying the language in section 21 to the declaration of section
23, added in 1935, that "contractor" included for purposes of that
section "any subcontractor," the court concluded that Koenig was en-
titled to a lien as a supplier to Gomorra. The court reasoned as fol-
lows:

> "Thus, it appears that, under a reasonable interpretation of
> the [Mechanics' Liens] Act, plaintiffs, who furnished the materi-
> als employed in the construction of sewer rings, *involving
> forms work and the use of concrete*, as well as defendant Go-
> morra ***, which provided the completed sewer rings, can
> properly be regarded as *subcontractors* under the definition in
> the Lien Act. Inasmuch as plaintiffs furnished these materials
> to *another subcontractor* for the construction of a public im-
> provement and gave proper notice of their unpaid claims, plain-
> tiffs were properly entitled to a lien on the money *** due the
> defendant McCarthy Construction Co. ***." (Emphasis added.)
> *Koenig*, 344 Ill. App. at 99-100, 100 N.E.2d at 341.

*Koenig* has not been overruled in its holding that both Gomorra
and Koenig were "subcontractors," by virtue of having furnished ma-
terial to be employed in the process of construction as a means of as-
sisting in concrete form work, and has been cited as authority for
that proposition. (*Annot.*, 24 A.L.R.4th 963, 989 (1983).) The same
reasoning applied in *Koenig* is logically applied to the facts of the in-
stant case. All of the parties agree, as stated in their briefs submitted
to this court and at oral argument, that Quinn subcontracted the con-
crete work on the Project to Dew, who subcontracted the concrete
forming work to Conform, and that Aluma supplied Conform with
concrete forms and related equipment which was used in the process
of construction. Therefore, like Koenig, Conform was certainly a
"subcontractor" within the statutory meaning of that term, and argu-
ably Aluma as well. It is also undisputed that there was a written con-
tract between Conform and Aluma which on its face tied Aluma's
rental equipment directly to the "Clarence Dew/Bio-Tech/Chicago
Technology Park" project. Accordingly, we hold that Aluma was, by
virtue of being a supplier to a subcontractor, a proper lien claimant
within the protection of section 23. While Aluma's complaint did not
specifically allege that the rental equipment it provided consisted of
concrete forms or was otherwise utilized in concrete forming work on
the Project, it seems highly likely that Aluma will be able to establish

this fact at trial. Therefore, plaintiff should be permitted to amend its complaint to include this allegation. See *Douglas Lumber Co. v. Chicago Home for Incurables* (1942), 380 Ill. 87, 94-95, 99, 43 N.E.2d 535, 538, 540.

■ Finally, we find no reason to believe that Aluma's section 23 claim should be excluded because its equipment was rented, rather than supplied to and consumed in the building project. There is authority for the conclusion that, either by virtue of having provided rental equipment for use in the construction process (see *New Erie Coal Co. v. H. McMullen & Sons* (1928), 247 Ill. App. 515), or by virtue of having provided equipment used in the process of concrete form work (see *D.D. Kennedy, Inc. v. Lake Petersburg Association* (1964), 54 Ill. App. 2d 85, 107-08, 203 N.E.2d 145, 152-53), Aluma's claim for the rental value of its equipment is within the ambit of the Mechanics' Liens Act.

Once again, it is important to state that our holding is limited to finding that Aluma, under the facts of this case, is a proper lien claimant within the scope of section 23, being a supplier to a subcontractor, as that term has been interpreted in *Koenig*. There is no need, for the purpose of deciding the issues presented, to consider the broader question of whether section 23 extends to fourth-tier claimants, generally, or to all those who, in a direct chain of contracts leading to the prime contractor, perform services in furtherance of the original contract.

■ We turn next to that portion of the trial court's order granting Firemen's motion to dismiss plaintiff's claim under the Bond Act. Firemen's contends that plaintiff's claim must fail for two reasons: (1) Aluma is not a proper claimant under the terms of the payment bond, or within the meaning of the statute, because it did not have a contractual relationship with either the general contractor (Quinn), or the general contractor's subcontractor (Dew) and (2) Aluma did not supply labor or materials, which are within the bond's coverage, but instead furnished rental equipment, which is outside the scope of coverage.

This court has held that the Bond Act provides a separate and alternative remedy to that afforded by section 23 of the Mechanics' Liens Act. (*Northwest Water Comm'n v. Carlo V. Santucci, Inc.* (1987), 162 Ill. App. 3d 877, 898, 516 N.E.2d 287, 301; *City of Chicago ex rel. Charles Equipment Co. v. United States Fidelity & Guaranty Co.* (1986), 142 Ill. App. 3d 621, 626, 491 N.E.2d 1269, 1272.) The purpose of sections 1 and 2 (Ill. Rev. Stat. 1985, ch. 29, pars. 15, 16) of the Bond for Public Works Act is to protect payment to contractors and materialmen for whom no right of mechanics' lien exists

against a public body, and to regulate claims against public monies. (*Charles Equipment Co.*, 142 Ill. App. 3d at 626, 491 N.E.2d at 1272.) Unlike section 23 of the Mechanics' Liens Act, which limits the amount of a claimant's recovery to the sum still due its immediate contractor at the time the notice of lien is served (*Decatur Housing Authority ex rel. Harlan E. Moore & Co. v. Christy-Foltz, Inc.* (1983), 117 Ill. App. 3d 1077, 1081, 454 N.E.2d 379, 382; *Koenig v. McCarthy Construction Co.* (1951), 344 Ill. App. 93, 104, 100 N.E.2d 338, 343), recovery under the Bond Act is limited only by the total amount of the bond, which is provided by a surety (*Housing Authority v. Holtzman* (1970), 120 Ill. App. 2d 226, 240, 256 N.E.2d 873, 880).

According to section 1 of the Bond for Public Works Act:

"All officials, boards, commissions or agents of this State *** in making contracts for public work of any kind to be performed for the State *** shall require every contractor for such work to furnish, supply and deliver a bond to the State *** with good and sufficient sureties. The amount of such bond shall be fixed by such officials, boards, commissions, commissioners or agents, and such bond, among other conditions, shall be conditioned for the completion of the contract, for the *payment of material used in such work* and for all labor performed in such work, whether by *subcontractor or otherwise.*

Each such bond is deemed to contain the following provisions whether such provisions are inserted in such bond or not:

'The principal and sureties on this bond agree that all the undertakings *** of the contract or contracts entered into between the principal and the State *** will be performed *** and to pay all persons, firms and corporations *having contracts with the principal or with subcontractors,* all just claims due them under the provisions of such contracts for labor performed or materials furnished in the performance of the contract on account of which this bond is given ***.' " (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 29, par. 15.)

Section 2 of the Bond Act, outlining the procedure by which a claimant may recover on the surety bond, declares:

"*Every person furnishing material or performing labor, either as an individual or as a sub-contractor for any contractor,* with the State *** shall have the right to sue on such bond in the name of the State *** for his use and benefit ***." (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 29, par. 16.)

Section 2 also contains the Bond Act's technical notice and filing pro-

visions, which are not germane to this appeal. The parties agree that plaintiff complied in every way with the procedural requirements of the statute.

As mandated by section 1, Quinn provided both a performance bond and a payment bond for the Project, with Firemen's as surety. The terms of the payment bond expressly provided:

"1. A claimant is defined as any person, firm or corporation *having contracts with Principal or with Principal's subcontractor* for labor or materials furnished in the performance of the Contract on account of which this bond is given.

2. Nothing in the Bond *** shall be taken to make the Obligee liable to any subcontractor, materialman, or laborer, or to any other person to any greater extent than it would have been liable prior to the enactment of an act entitled 'An Act in Relation to Bonds of Contractors Entering into Contracts for Public Construction,' approved June 20, 1931, as amended ***." (Emphasis added.)

■■■ Although the express provisions of the statute are deemed to be contained in every bond for a public construction project, whether actually inserted in the bond or not, the contractor and its surety are free to contract with the public entity for additional liability which exceeds the statutory provisions. (*Illinois State Toll Highway Comm'n v. M.J. Boyle & Co.* (1962), 38 Ill. App. 2d 38, 51, 186 N.E.2d 390, 396.) Here, it is apparent from the very precise language quoted above that the parties intended no such extension of liability. The coverage of the bond, therefore, both in terms of categories of claimants and types of materials covered, is no broader than what the statute itself would require.

With respect to claimants, the statute requires that all bonds guarantee payment to persons "having contracts with the principal or with subcontractors." (Ill. Rev. Stat. 1985, ch. 29, par. 15.) It reasonably follows that sub-subcontractors and suppliers to subcontractors (*i.e.*, persons occupying the position of Conform) are statutorily permitted to recover. (*Housing Authority v. Holtzman* (1970), 120 Ill. App. 2d 226, 256 N.E.2d 873.) As the *Holtzman* court observed, the Bond Act was originally enacted in 1931, four years before the legislature extended coverage of section 23 of the Mechanics' Liens Act to those who had not contracted directly with the principal contractor, and thus provided an alternative remedy for those not entitled to a lien. (*Holtzman*, 120 Ill. App. 2d at 239, 256 N.E.2d at 880.) Although we have found no Illinois appellate case upholding a Bond Act claim by a supplier to a sub-subcontractor, or a person occupying the fourth

tier in the contractual chain, we also have found no authority specifically excluding them from coverage.

Firemen's points to the holding of the United States Supreme Court that recovery under the analogous Federal statute, known as the Miller Act (40 U.S.C. §270a through 270d (1988)), does not extend beyond a sub-subcontractor, and would exclude a fourth-tier claimant such as Aluma. (*Clifford F. MacEvoy Co. v. United States* (1944), 322 U.S. 102, 88 L. Ed. 1163, 64 S. Ct. 890; see also *United States v. Idaho Crane & Rigging Co.* (D. Idaho 1961), 193 F. Supp. 802.) The Court in *MacEvoy* stated:

> "Congress cannot be presumed, in the absence of express statutory language, to have intended to impose liability on the payment bond in situations where it is difficult or impossible for the prime contractor to protect himself. The relatively few subcontractors who perform part of the original contract represent in a sense the prime contractor and are well known to him. It is easy for the prime contractor to secure himself against loss by requiring the subcontractors to give security by bond *** for the payment of those who contract directly with the subcontractors. [Citations.] But this method of protection is generally inadequate to cope with remote and undeterminable liabilities incurred by an ordinary materialman ***. To impose unlimited liability under the payment bond to those sub-materialmen and laborers is to create a precarious and perilous risk on the prime contractor and his surety. To sanction such a risk requires clear language in the statute and in the bond so as to leave no alternative." *MacEvoy*, 322 U.S. at 110-11, 88 L. Ed. at 1169, 64 S. Ct. at 895.

The Supreme Court in *MacEvoy* also construed the word "subcontractor," as used in the Miller Act, to be "a subcontractor who performs for and takes from the prime contractor a specific part of the labor or material requirement of the original contract," consistent with what it stated was the "more technical meaning, as established by usage in the building trades," although "[i]n a broad, generic sense a subcontractor includes anyone who has a contract to furnish labor or material to the prime contractor." (*MacEvoy*, 322 U.S. at 108-09, 88 L. Ed. at 1168, 64 S. Ct. at 894.) Nonetheless, whatever validity there may be to the Court's public policy rationale or its choice of definition for purposes of the Miller Act, neither can determine the construction and application of Illinois statutes. First, authority construing a Federal statute is not binding on the courts of this State in interpreting our legislation. More importantly, the Miller Act is distin-

guished from the Illinois Bond Act in a significant respect. The Federal law's legislative history clearly supports the conclusion that Congress intended its protection to extend only to the level of a (third-tier) sub-subcontractor, and the *MacEvoy* decision was based in part on that legislative history. While the term "subcontractor" is undefined in the Bond Act, as it is in the Miller Act, there is neither legislative history nor case authority to guide a reviewing court in construing that term. However, we need not engage in statutory construction because we conclude that the second ground argued by Firemen's would in any event preclude Aluma's claim.

Plaintiff's complaint in the instant case alleges, *inter alia*, that it "entered into a subcontract agreement to rent certain materials to Conform Erectors, Inc., for the *** [P]roject." A copy of this agreement, attached to the complaint, establishes that the contract was solely for the purpose of supplying rented equipment for a limited duration at a stated monthly fee. In 1976, a panel of this division addressed the question of rental equipment and machinery under the Bond Act, in a somewhat different but highly relevant context. *Board of Local Improvements v. St. Paul Fire & Marine Insurance* (1976), 39 Ill. App. 3d 255, 350 N.E.2d 36.

The plaintiff in *Board of Local Improvements* had rented heavy construction equipment to a general contractor. The contractor's bond, while paralleling the statutory language in requiring payment to those "furnishing materials for or performing labor in the prosecution of the work," expressly provided for additional coverage for "all amounts due for materials, lubricants, oil, gasoline, coal and coke, *repairs on machinery*, equipment, and tools, consumed *or used in connection with* the construction of such work." (*Board of Local Improvements*, 39 Ill. App. 3d at 256-57, 350 N.E.2d at 38.) Plaintiff's loader was used at the jobsite for five months, but the rental fee was not paid by the subcontractor to which it was delivered. Subsequently, plaintiff sought recovery under the Bond Act for the rental fee, as well as for the amount expended for labor, service and parts used to repair and maintain the loader. This court agreed with the trial court that the bond as written provided greater coverage than that required by law, by virtue of the enumerated inclusions as well as the use of the phrase "used in connection with the construction of such work." However, this court reversed the trial court's finding that the phrase, "repairs on machinery, equipment, and tools," meant that the bond assured the payment of rental fees for use of equipment and machinery. The court reasoned that "equipment" was to be read only in the context of the phrase "repairs on," and that, accordingly, only the

claim for repair charges could survive. *Board of Local Improvements*, 39 Ill. App. 3d at 258-59, 350 N.E.2d at 39.

While *Board of Local Improvements* did not expressly hold that a bond which is merely coextensive with the mandatory coverage under the statute would *not* guarantee payment of rental fees for equipment used on a public works construction project, its rationale and holding are inconsistent with any other conclusion. Clearly, if we had concluded that the plaintiff in that case was entitled to rely upon the coverage deemed included in the bond by virtue of the statute, with or without broader language, its claim for rental payments for equipment used at the jobsite would have been valid. To date, although equipment rental claims have been upheld under section 23 of the Mechanics' Liens Act (see *New Erie Coal Co. v. H. McMullen & Sons* (1928), 247 Ill. App. 515), no Illinois decision has construed the Bond Act, where the bond itself does not exceed the requirements of the statute, to guarantee payment for rental fees for equipment or machinery used on a jobsite but not consumed in the process of construction. Absent clear legislative intent to the contrary, we see no reason to depart from our prior holding in this regard. Accordingly, we find that the trial court did not err in dismissing Aluma's Bond Act claim.

For the reasons stated, we affirm the trial court's order of September 16, 1987, granting Firemen's motion to dismiss Aluma's claim against the surety bond. However, we reverse the trial court's order of May 26, 1987, which granted Quinn's motion to dismiss plaintiff's mechanics' lien claim and ruled that its notices of lien claim were null and void. We remand for further proceedings consistent with this opinion.

In so holding, we would make the following general observations. Legislation relating to public mechanics' liens is by its very nature technical and procedurally complex. It attempts to create an orderly process to fairly and expeditiously handle competing contractual claims in a specialized field with its own practices and terms of the trade. For important policy reasons, the legislature has created valuable rights and remedies which are available to certain categories of contributors to public works projects, but unavailable to creditors generally. Enforcement of such rights is necessarily limited to those who are clearly entitled to them under the relevant statutes. However, as the practices and economic realities of the construction industry and of public bodies change over the course of many decades, reviewing courts are called upon to construe and define the law in this area, in piecemeal fashion, working with precedents established decades earlier, while calling upon a limited body of case law and even more lim-

ited legislative history. All of these factors make the task of the reviewing court a difficult one at best, as our duty is to apply and interpret the law so as to carry out the intent of the legislature while affording substantial justice to the litigants. Legislative definition of various terms and further clarification of procedural requirements would no doubt greatly assist the courts in that endeavor.

Affirmed in part; reversed in part and remanded with directions.

MURRAY and GORDON,* JJ., concur.

---

*Justice R. Eugene Pincham participated in this case prior to his resignation. Since that time, Justice Joseph Gordon was designated the third member of the panel, and he has read the record and briefs and has listened to the oral argument tapes.