# ILLINOIS OFFICIAL REPORTS

## Supreme Court

### *People v. Gutman*, 2011 IL 110338

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. IRIT GUTMAN, Appellee. |
| Docket No. | 110338 |
| Filed | December 1, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The term "proceeds" as used in the Illinois money laundering statute is not defined, but means receipts, rather than the profits, from illegal activity–conviction and restitution order for overbilling the state upheld. |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. James B. Linn, Judge, presiding. |
| Judgment | Appellate court judgment affirmed in part and reversed in part; circuit court judgment affirmed. |

Counsel on
Appeal

Lisa Madigan, Attorney General, of Springfield, and Anita Alvarez, State's Attorney, of Chicago (Michael A. Scodro, Solicitor General, and Michael M. Glick and Michael R. Blankenheim, Assistant Attorneys General, of Chicago, of counsel), for the People.

Gal Pissetzky, of Pissetzky & Berliner LLC, and Beau B. Brindley, both of Chicago, for appellee.

Justices

JUSTICE THOMAS delivered the judgment of the court, with opinion.

Chief Justice Kilbride and Justices Freeman, Garman, Karmeier, Burke, and Theis concurred in the judgment and opinion.

**OPINION**

¶ 1 Following a bench trial in the circuit court of Cook County, defendant, Irit Gutman, was convicted of theft (720 ILCS 5/16-1 (West 2000)), vendor fraud (305 ILCS 5/8A-3 (West 2000)), and money laundering (720 ILCS 5/29B-1 (West 2000)). The trial court sentenced defendant to 66 months' imprisonment and ordered her to pay $1.2 million in restitution. The appellate court upheld defendant's theft and vendor fraud convictions, but reversed her money laundering conviction and remanded for a new trial. 401 Ill. App. 3d 199. The State appeals the appellate court's reversal of the money laundering conviction, and we now reverse the appellate court.

¶ 2                                    BACKGROUND

¶ 3 The facts, including a complete summary of the trial testimony, are set forth fully in the appellate court opinion. *Id*. at 201-08. The issues are far narrower before this court than they were before the appellate court, and we summarize here only those facts that are necessary to an understanding of our decision.

¶ 4 The Illinois Medical Assistance Program (the program) pays for medical services provided to low-income individuals. The program hires private companies to transport patients to and from medical appointments. When a patient needs transportation, the program contacts a transportation company and explains what service is needed. After the transportation company provides the service, it submits a bill to the program. Different categories of service are paid at different rates. For instance, transporting a person in a wheelchair pays twice as much as transporting a person not in a wheelchair.

¶ 5 Defendant and Iyla Lubenskiy formed one of these companies, Egra Medical Transportation, in 1995. On one occasion, the program accidently sent Egra a form with an incorrect service code, and this gave defendant an idea. Defendant suggested that they begin

purposely changing the codes on approval forms. For example, they could increase their billings by changing the category of service, altering the destination, or increasing the number of miles. According to Lubenskiy, they began to submit false bills, but initially did so infrequently. On December 1, 1999, defendant and Lubenskiy entered into an agreement with the federal government in which they agreed to be permanently barred from participating in the Medicare program, all other federal health-care programs, and the Illinois Medical Assistance Program.

¶ 6        Defendant, Lubenskiy, and Mike Tishel later reformed the company as Universal Transportation Company (UPT). Because Lubenskiy and defendant had been barred from participating in the program, they needed a third person to appear to be the sole owner of the company. Under this arrangement, defendant and Lubenskiy ran the company, but Tishel received a salary and appeared to be the owner. UPT commenced doing business on January 16, 2001. The business operated as it always had, with the same drivers, vehicles, employees, and office space. Lubenskiy continued to do the bookkeeping, and defendant used an alias when she spoke with the public aid office. As Egra had done earlier, UPT submitted false billings and overbilled for mileage. Checks that UPT received from the State of Illinois were deposited into an account on which only Tishel and his son appeared as authorized signatories.

¶ 7        Money that was deposited into UPT's account was later transferred into Tishel's personal account, and from here it was transferred to defendant's account. Defendant used these funds to purchase single family homes in her own name. At least one property was transferred to defendant's son, and Lubenskiy testified that this was done to hide the property. Defendant and Lubenskiy also used UPT funds to purchase cars for themselves. Between January 16, 2001, and February 2002, UPT billed the State of Illinois approximately $6 million and received approximately $3 million. An auditor provided evidence of the extent to which UPT provided false billings to the state and overbilled for mileage.

¶ 8        The State charged defendant, Lubenskiy, Tishel, and UPT with vendor fraud, theft, and money laundering. Lubenskiy pleaded guilty to vendor fraud and testified against the other three defendants. Defendant, Tishel, and UPT were tried in severed but simultaneous bench trials. The trial court found defendant guilty on all counts. The court later merged the vendor fraud and theft counts, sentenced defendant to 66 months' imprisonment, and ordered her to pay $1.2 million in restitution.

¶ 9        Defendant appealed, arguing that: (1) the trial court erred in allowing the State to establish her guilt of money laundering with evidence of UPT's gross receipts rather than its profits; (2) the State knowingly used perjured testimony; (3) she received the ineffective assistance of counsel; and (4) she was not proved guilty beyond a reasonable doubt of any of the charges. The appellate court rejected all of defendant's arguments except for the first one. The court held that this argument was forfeited because defendant failed to raise it in the trial court. However, the court elected to review the issue under the plain-error doctrine. 401 Ill. App. 3d at 211-12. Based largely on a misreading of the Supreme Court's opinion in *United States v. Santos*, 553 U.S. 507 (2008), the appellate court concluded that the word "proceeds" in the Illinois money laundering statute (720 ILCS 5/29B-1(b)(4) (West 2000)) should be read as "profits" rather than "receipts." *Id*. at 212-13. Because the State failed to

provide evidence that the funds defendant was accused of laundering represented UPT's profits, the appellate court reversed defendant's money laundering conviction and remanded the matter for a new trial.[1] *Id*. at 225-26. We allowed the State's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Feb. 26, 2010).

¶ 10                                                                ANALYSIS

¶ 11        The State makes two arguments on appeal: (1) that the term "proceeds" in the money laundering statute means "gross receipts" rather than "profits" and therefore the appellate court erred in vacating defendant's money laundering conviction; and (2) that even if the trial court erred in allowing the State to establish defendant's guilt through the use of gross receipts, any error was not "clear or obvious" and thus plain-error review was not available to the defendant. We agree with the State's first point that no error occurred, and we thus do not need to determine whether plain-error review is available to defendant.

¶ 12        The principal issue before the court is one of statutory construction, and the principles guiding our review are familiar. The primary objective of statutory construction is to ascertain and give effect to the legislature's intent. The most reliable indicator of legislative intent is the language of the statute, given its plain and ordinary meaning. *People v. Garcia*, 241 Ill. 2d 416, 421 (2011). We view the statute as a whole, construing words and phrases in light of other relevant statutory provisions and not in isolation. Each word, clause, and sentence of a statute must be given a reasonable meaning, if possible, and should not be rendered superfluous. *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 279-80 (2003). The court may consider the reason for the law, the problems sought to be remedied, the purposes to be achieved, and the consequences of construing the statute one way or another. *Garcia*, 241 Ill. 2d at 421. Also, a court presumes that the legislature did not intend to create absurd, inconvenient, or unjust results. *People v. Christopherson*, 231 Ill. 2d 449, 454 (2008). Pursuant to the rule of lenity, ambiguous criminal statutes will generally be construed in the defendant's favor. *People v. Jones*, 223 Ill. 2d 569, 581 (2006). However, the rule of lenity is subordinate to our obligation to determine legislative intent, and the rule of lenity will not be construed so rigidly as to defeat legislative intent. *Garcia*, 241 Ill. 2d at 427. Statutory construction is a question of law, and our review is *de novo*. *Id.* at 421.

¶ 13        At the relevant time, section 29B-1 of the Criminal Code of 1961 provided that a person commits money laundering:

         "when he knowingly engages or attempts to engage in a financial transaction in criminally derived property with either the intent to promote the carrying on of the

---

[1]We note that it is not entirely clear that this is even a forfeitable issue or that a new trial was the appropriate remedy. In *Santos*, the defendants were able to raise the issue for the first time in a collateral proceeding, and the defendants had their convictions vacated outright on the basis that, if "profits" is the correct definition of "proceeds," then there was insufficient evidence supporting their convictions. See *Santos*, 553 U.S. at 510; *Santos v. United States*, 461 F.3d 886, 889 (7th Cir. 2006). Nevertheless, because we hold that "gross receipts" is the correct definition of "proceeds" in the Illinois money laundering statute, we need not resolve this issue.

-4-

unlawful activity from which the criminally derived property was obtained or where he knows or reasonably should know that the financial transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership or the control of the criminally derived property." 720 ILCS 5/29B-1(a) (West 2000).

Section 29B-1(b)(4) defined "criminally derived property" as "any property constituting or derived from *proceeds* obtained, directly or indirectly, pursuant to a violation of the Criminal Code of 1961, the Illinois Controlled Substances Act or the Cannabis Control Act." (Emphasis added.) 720 ILCS 5/29B-1(b)(4) (West 2000). The term "proceeds" is undefined in section 29B-1. That section has since been substantially amended, but still contains no definition of "proceeds." See 720 ILCS 5/29B-1 (West 2010).

¶ 14 Defendant argues that the word "proceeds" is ambiguous, in that it can refer either to receipts or profits. Thus, according to defendant, the statute must be construed in her favor to mean profits. The State argues that "proceeds" unambiguously refers to receipts. We agree with defendant that the word "proceeds" in section 29B-1 is ambiguous, but we agree with the State that it should be read as receipts.

¶ 15 The term "proceeds" can refer to either receipts or profits. The State is correct that the primary dictionary definition refers to the total amount brought in from a transaction. See Webster's Third New International Dictionary 1807 (1993) ("what is produced by or derived from something (as a sale, investment, levy, business) by way of total revenue : the total amount brought in"). However, Webster's also provides "profits" as a secondary definition. *Id*. ("the net profit made on something"). Black's provides a little more support for the State's position. Black's defines "proceeds" as either "[t]he value of land, goods, or investments when converted into money; the amount of money received from a sale;" or "[s]omething received upon selling, exchanging, collecting, or otherwise disposing of collateral." Black's Law Dictionary 1325 (9th ed. 2009). Black's uses the term "net proceeds" to refer to "[t]he amount received in a transaction minus the costs of the transaction (such as expenses and commissions)." *Id*. The Uniform Commercial Code also uses a receipts definition, defining "proceeds" as "whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral." U.C.C. § 9-102(a)(64)(A). The plurality and the dissent in *Santos* agreed that, as both definitions are proper, the issue could not be solved merely by consulting a dictionary. See *Santos*, 553 U.S. at 511-12; *Id*. at 532 (Alito, J., dissenting, joined by Roberts, C.J., Kennedy and Breyer, JJ.). We agree with the Supreme Court that the issue is not quite so simple, and we will consider further statutory construction aids.

¶ 16 *Santos*

¶ 17 A federal court's construction of a federal statute is not binding on Illinois courts in construing a similar state statute. See *Aluma Systems, Inc. v. Frederick Quinn Corp.*, 206 Ill. App. 3d 828, 856 (1990). We will nevertheless consider *Santos* at length because the plurality and dissenting opinions contain thorough and reasoned arguments for the "profits" and "receipts" definitions respectively.

-5-

¶ 18    The Supreme Court granted *certiorari* in *Santos* to resolve a conflict in the federal circuit courts over how the term "proceeds" should be defined in the federal money laundering statute (18 U.S.C. § 956(a)(1) (2006)). In *United States v. Scialabba*, 282 F.3d 475, 476-78 (7th Cir. 2002), the Seventh Circuit held that "proceeds" in the federal money laundering statute should be defined as "net income" rather than "gross income." Other circuits had previously used a "gross income" definition, without wading into the "gross income" versus "net income" dispute. See *United States v. Silvestri*, 409 F.3d 1311, 1332-33 (11th Cir. 2005); *United States v. Akintobi*, 159 F.3d 401, 403-04 (9th Cir. 1998); *United States v. Haun*, 90 F.3d 1096, 1101 (6th Cir. 1996). After *Scialabba* rejected this approach in favor of a net income approach, the other circuits to consider the question rejected the *Scialabba* approach. See *United States v. Grasso*, 381 F.3d 160, 167-69 (3d Cir. 2004) (arguing that *Scialabba* reached an "incorrect result" and that "proceeds" means "simply gross receipts from illegal activity"), *vacated on other grounds*, 544 U.S. 945 (2005); *United States v. Huber*, 404 F.3d 1047, 1058 (8th Cir. 2005) (following *Grasso*); *United States v. Iacaboni*, 363 F.3d 1, 4 (1st Cir. 2004). In *Santos*, the Seventh Circuit acknowledged that *Scialabba* had been rejected by the other circuits to consider the question, but elected to adhere to its position. *Santos*, 461 F.3d at 891-94. The court invited Congress or the Supreme Court to definitively resolve the debate. *Santos*, 461 F.3d at 894.

¶ 19    The Supreme Court accepted the invitation, but issued a fractured decision that did not resolve the debate one way or the other. Four justices argued that "proceeds" should be defined as "profits" (*Santos*, 553 U.S. at 509-24); four argued that it should be defined as "gross receipts" (*Id*. at 531-49 (Alito, J., dissenting, joined by Roberts, C.J., Kennedy and Breyer, JJ.)); and one believed that whether it means "gross receipts" or "profits" depends on the nature of the underlying offense (*Id.* at 524-28 (Stevens, J., concurring)).

¶ 20    The appellate court based its conclusion that "proceeds" should be defined as "profits" on a misreading of *Santos*. According to the appellate court, the United States Supreme Court held that "proceeds" in the federal money laundering statute (see 18 U.S.C. § 1956(a)(1) (2006)) should be defined as "profits" rather than "gross receipts" because the statute is ambiguous and the "profits" definition is always more defendant-friendly. Thus, the defendant should prevail under the rule of lenity. 401 Ill. App. 3d at 213 (citing *Santos*, 553 U.S. at 514).

¶ 21    What the appellate court described as a Supreme Court "holding," however, is merely the conclusion of a plurality opinion. Justice Stevens provided the fifth vote to apply a "profits" definition, but he did not believe that "proceeds" should always be defined as "profits." In *Santos*, the underlying offense was the operation of an illegal lottery, and Justice Stevens believed that applying a "gross receipts" definition of "proceeds" on these facts would lead to a perverse result. *Santos*, 553 U.S. at 528 (Stevens, J., concurring). Using a "gross receipts" definition of "proceeds" with respect to operation of an illegal lottery would lead to a "merger" problem: the mere payment of the expenses of operating an illegal gambling business would amount to money laundering. *Id.* at 526-27. In other words, a transaction that is a normal part of the underlying crime could lead to an additional money laundering charge and allow for a radical increase in the defendant's sentence. *Id.* at 528. Thus, although Justice Stevens found Justice Alito's dissent persuasive that the legislative history of the federal

money laundering statute indicated a "gross receipts" definition of "proceeds," he believed that a "profits" definition had to be used if the underlying crime was the operation of an unlicensed gambling business. *Id*. at 528 n.7. On that basis alone, Justice Stevens concurred in the judgment, while explicitly rejecting the view of the plurality that the rule of lenity required that "proceeds" always be defined as "profits." *Id*. at 524-28.

¶ 22　　When a divided Supreme Court decides a case and no single rationale explaining the result receives the agreement of five justices, " 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.' " *Marks v. United States*, 430 U.S. 188, 193 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976)). This, as we shall see, is often easier said than done. While the actual holding of *Santos* is less than clear, what is entirely clear is that it is not what the appellate court said that it was: that "proceeds" should always be defined as "profits." Five members of the court clearly and explicitly rejected this proposition. See *Santos*, 553 U.S. at 526 n.3 (Stevens, J., concurring); *Id*. at 531-49 (Alito, J., dissenting, joined by Roberts, C.J., Kennedy and Breyer, JJ.).

¶ 23　　As the *Santos* plurality conceded, Justice Stevens's concurrence determines the scope of the court's holding. *Santos*, 553 U.S. at 523. However, the members of the Supreme Court cannot agree on how Justice Stevens's concurrence should be read, and the various circuits of the United States Court of Appeals have split on this matter as well. The *Santos* plurality argued that Justice Stevens's position was that "proceeds" means "profits" when "there is no legislative history to the contrary." *Id.* Justice Stevens emphatically rejected this reading of his concurrence, stating that it was "not correct" and was the " 'purest of dicta.' " *Id.* at 528 n.7 (Stevens, J., concurring). Justice Stevens elaborated on how his concurrence should be read:

>"[M]y conclusion rests on my conviction that Congress could not have intended the perverse result that the dissent's rule would produce if its definition of 'proceeds' were applied to the operation of an unlicensed gambling business. In other applications of the statute not involving such a perverse result, I would presume that the legislative history summarized by JUSTICE ALITO reflects the intent of the enacting Congress." *Id.*

¶ 24　　The Third and Seventh Circuits have adopted the *Santos* plurality's analysis of Justice Stevens's concurrence: that "proceeds" means "profits" in any situation in which the legislative history does not indicate to the contrary. See *United States v. Lee*, 558 F.3d 638, 643 (7th Cir. 2009); *United States v. Yusuf*, 536 F.3d 178, 186 n.12 (3d Cir. 2008). The Fourth, Eighth, and Eleventh Circuits, by contrast, hold that the *Santos* rule is that "proceeds" must be defined as "profits" only where the underlying criminal activity is the running of an illegal gambling operation. See *United States v. Spencer*, 592 F.3d 866, 879-80 & n.4 (8th Cir. 2010); *United States v. Demarest*, 570 F.3d 1232, 1242 (11th Cir. 2009); *United States v. Howard*, 309 F. App'x 760, 771 (4th Cir. 2009) (unpublished). The First and Ninth Circuits read *Santos* to mean that "proceeds" means "profits" only when the merger problem identified in *Santos* arises from a "gross receipts" definition. *United States v. Bucci*, 582 F.3d 108, 123-24 (1st Cir. 2009); *United States v. Van Alstyne*, 584 F.3d 803, 814 (9th Cir. 2009). The Sixth Circuit holds that "proceeds" means "profits" only when the predicate

offense "creates a merger problem that leads to a radical increase in the statutory maximum sentence and only when nothing in the legislative history suggests that Congress intended such an increase." *United States v. Kratt*, 579 F.3d 558, 562 (6th Cir. 2009). Finally, the Fifth Circuit holds that *Santos* requires a bifurcated approach to determine when "proceeds" should be defined as "profits": first, a court determines whether using a "gross receipts" definition would lead to the "merger problem." If so, then a profits definition must be used. If not, then a court looks to the legislative history and uses a "gross receipts" definition unless the legislative history affirmatively shows that a "profits" definition was intended. *Garland v. Roy*, 615 F.3d 391, 401 (5th Cir. 2010).

¶ 25    The problem, of course, with all of the above interpretations is that they rest upon the assumption that the definition of a statutory term can change depending upon the facts of the case, and eight members of the Supreme Court soundly reject this proposition. The plurality opinion pointed out that Justice Stevens's position could not be squared with *Clark v. Martinez*, 543 U.S. 371 (2005), which rejected the notion that the same word in the same statutory provision could have different meanings in different factual contexts. The *Clark* Court explained that this would render every statute a "chameleon" (*id*. at 382) and establish "the dangerous principle that judges can give the same statutory text different meanings in different cases" (*id*. at 386). The four dissenting justices in *Santos* agreed with the plurality that the meaning of "proceeds" should not vary depending on the nature of the illegal activity that produced the laundered funds. *Santos*, 553 U.S. at 532, 548 (Alito, J., dissenting, joined by Roberts, C.J., Kennedy and Breyer, JJ.). Unlike the federal courts, we are not required to discern the meaning of Justice Stevens's concurrence and attempt to apply it, and we agree with a majority of the Supreme Court that the best approach is to pick either a "profits" or "receipts" definition of the word "proceeds." We summarize below the arguments of the four-justice plurality and the four-justice dissent in favor of the "profits" and "receipts" definitions respectively.

¶ 26    The *Santos* plurality saw the issue as fairly straightforward. The plurality noted that dictionaries support either a "receipts" or a "profits" definition, and that the context of the money laundering statute did not resolve the ambiguity. *Id.* at 511-12. Either definition could be plugged into the statute satisfactorily. *Id.* at 512. The plurality acknowledged the dissent's list of money laundering laws that contained a "receipts" definition, but saw no evidence that Congress drafted the federal money laundering statute with those as a backdrop. Indeed, the federal money laundering statute predated most of the laws listed by the dissent. *Id*. at 512-13. The plurality stated that, pursuant to the rule of lenity, "the tie must go to the defendant." *Id.* at 514. Because the "profits" construction is always more defendant-friendly than the "receipts" definition, the plurality argued that it must be adopted. *Id.*

¶ 27    According to the plurality, using a receipts definition would lead to a "merger problem," at least in the case before the court:

> "If 'proceeds' meant 'receipts,' nearly every violation of the illegal-lottery statute would also be a violation of the money-laundering statute, because paying a winning bettor is a transaction involving receipts that the defendant intends to promote the carrying on of the lottery. Since few lotteries, if any, will not pay their winners, the statute criminalizing illegal lotteries, 18 U.S.C. § 1955, would 'merge' with the

money-laundering statute. Congress evidently decided that lottery operators ordinarily deserve up to 5 years of imprisonment, § 1955(a), but as a result of merger they would face an additional 20 years, § 1956(a)(1). Prosecutors, of course, would acquire the discretion to charge the lesser lottery offense, the greater money-laundering offense, or both–which would predictably be used to induce a plea bargain to the lesser charge." *Id*. at 515-16.

The plurality contended that the "merger problem" arose not only with respect to illegal gambling operations, but also with respect to "a host of predicate crimes." *Id.* at 516. The plurality could see no explanation for why Congress would want a transaction that is a normal part of an underlying crime to radically increase the sentence for that crime, and argued that a "profits" definition would eliminate the merger problem. *Id.* at 517.

¶ 28      With respect to the dissent's argument that the "profits" definition presents too great a problem of proof for prosecutors, the plurality contended that this was turning the rule of lenity upside down and explained that the court interprets "ambiguous criminal statutes in favor of defendants, not prosecutors." *Id.* at 519. The plurality also believed that the difficulties in proof with a profits definition were overstated. *Id.* at 519-21.

¶ 29      Justice Alito dissented, and was joined by Chief Justice Roberts, Justice Kennedy, and Justice Breyer. The dissent argued that the plurality had too quickly declared the term "proceeds" to be "hopelessly ambiguous" and contended that its meaning could be determined through traditional methods of statutory interpretation. *Id*. at 531 (Alito, J., dissenting, joined by Roberts, C.J., Kennedy and Breyer, JJ.). First, the dissent pointed out that the term "proceeds" is a staple of money laundering laws, and that in every one that provides a definition, the word means " 'the total amount brought in.' " *Id*. at 532. The dissent cited the United Nations Convention Against Transnational Organized Crime, Nov. 15, 2000, 2225 U.N.T.S. 209 (Treaty No. I-39574), which has been adopted by 147 countries, including the United States; the Model Money Laundering Act (President's Commission on Model State Drug Laws, Economic Remedies, § C (1993)); and the 14 states that define the term "proceeds" in their money laundering statutes. *Id*. at 532-34. According to the dissent, this shows that when lawmakers use the term "proceeds" in a money laundering provision, they intend for it to reach all receipts and not just profits. *Id*. at 534-35.

¶ 30      Next, the dissent looked at the two primary objectives of money laundering provisions: (1) providing deterrence "by preventing drug traffickers and other criminals who amass large quantities of cash from using these funds 'to support a luxurious lifestyle' or otherwise to enjoy the fruits of their crimes"; and (2) inhibiting "the growth of criminal enterprises by preventing the use of dirty money to promote the enterprise's growth." *Id*. at 535-36. The dissent believed that both of these objectives would be frustrated with a "profits" definition because dirty money may be used to support a luxurious lifestyle or to grow an illegal enterprise even when the unlawful activity that generated the funds was unprofitable. Moreover, the dissent did not believe that Congress could have wanted to immunize successful criminal enterprises during those periods when they are "operating temporarily in the red." *Id*. at 536.

¶ 31      The dissent further contended that a "profits" definition would introduce "pointless and

difficult problems of proof" that Congress could not have intended. *Id.* at 536. The dissent examined the legislative history and concluded that Congress viewed money laundering as a very serious problem and could not have wanted to place daunting obstacles in the way of prosecutors in these cases. For instance, professional money launderers who are hired to launder the funds of criminal enterprises could be effectively placed beyond the reach of the statute. "A professional money launderer is not likely to know (or perhaps even to care) whether the enterprise is operating in the black when the funds in question were acquired." *Id.* at 537. The dissent further pointed out that, in drug cases, "[t]racing funds back to particular drug sales and proving that these sales were profitable will often prove impossible." *Id.* at 540. Morever, special accounting rules would have to be developed because "[t]here are no generally accepted accounting principles for determining the net income of illegal enterprises." *Id.* at 540. As an example of how difficult it could be to obtain this type of proof, the dissent explained that:

> "If a net income interpretation were taken to its logical conclusion, it presumably would be necessary as well to work out rules for the depreciation of instrumentalities of crime that must occasionally be replaced due to the efforts of law enforcement. But it seems quite implausible that Congress wanted courts or juries in money laundering cases to grapple with questions such as the useful life of, say, a drug processing plant or laboratory or the airplanes and boats that are used to smuggle drugs. And assuming that the accounting issues can ultimately be resolved by the courts, there would remain serious problems of proof. Illegal enterprises generally do not keep books and records like legitimate businesses do." *Id.* at 541-42.[2]

¶ 32        The dissent also did not see the "merger problem" as a reason to adopt a "profits" interpretation. The dissent viewed the "merger problem" as "fundamentally a sentencing problem" and argued that the remedy should lie in a defendant's sentence. *Id.* at 547. If a money laundering charge was based on activities that were no more than what is required for a violation of the underlying criminal statute, then the defendant's sentence should be no higher than it would have been without the money laundering charge. *Id.* The dissent also questioned whether a merger problem even existed in the case before it because it rested on the assumption that a defendant "promotes" an illegal gambling business simply by doing things that are routine parts of keeping the business running. However, the dissent found that this question was not before the court. *Id.* at 547-48. The dissent also noted that, even if there is a merger problem, it arises in only a small subset of cases, and that the meaning of the word "proceeds" should not be governed by these few cases. *Id.* at 548.

¶ 33        Finally, with respect to the rule of lenity, the dissent found it inapplicable. The dissent explained that the rule of lenity is not applied simply because it is possible to articulate a

---

[2]The Third Circuit had previously recognized the same thing in rejecting the Seventh Circuit's "net income" approach. See *Grasso*, 381 F.3d at 169 n.13 ("[I]t would be very difficult to prove that 'profits' were used to promote an illegal venture, since criminals rarely keep records of the overhead expenses of their illegal activities. Similarly, in an ongoing criminal business, it would be difficult to determine at what point a defendant had netted out all business expenses. When do criminal businesses operate by recognized auditing standards?").

construction more narrow than that advocated for by the government. Rather, when the meaning of a statute becomes clear through normal rules of statutory interpretation, resort to the rule of lenity is not required. The dissent argued that, when viewed in context, "the meaning of 'proceeds' in the money laundering statute emerges with reasonable clarity *** making the rule of lenity inapplicable." *Id*. at 548-49.

¶ 34    After *Santos* was issued, Congress amended the money laundering statute to add a definition of "proceeds." Congress adopted the dissent's position, and the federal statute now defines "proceeds" as "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity." Pub. L. No. 111-21, § 2(f) (adding 18 U.S.C. § 1956(c)(9)). Thus, the federal money laundering statute may now be added to the *Santos* dissent's list of money laundering laws that use a "gross receipts" definition.

¶ 35                    *The Meaning of "Proceeds" in Section 29B-1*

¶ 36    Between the plurality's and the dissent's positions in *Santos*, we find the dissent's more persuasive. Applying that reasoning and traditional canons of statutory construction leads us to the inescapable conclusion that the legislature intended "proceeds" to mean "gross receipts" in section 29B-1.

¶ 37    We begin by noting, as we did above, that the primary dictionary definition for "proceeds" refers to the total amount brought in from a transaction. Webster's provides a "profits" definition as a secondary definition (Webster's Third New International Dictionary 1807 (1993)), and Black's uses the term "net proceeds" rather than "proceeds" to mean "profits" (Black's Law Dictionary 1325 (9th ed. 2009)). We believe that established canons of statutory construction show that the legislature intended the primary definition.

¶ 38    The *Santos* plurality stated that the term "proceeds" had not acquired a common meaning in the federal criminal code. *Santos*, 553 U.S. at 511. Indeed, in some portions of the federal criminal code, the word is defined as "receipts," and in some others as "profits." *Id*. at 511-12 (citing 18 U.S.C. § 2339C(e)(3) (Supp. V 2006), §§ 981(a)(2)(A), (a)(2)(B) (2000). We agree with the State, however, that the Illinois legislature has a clear pattern of using the term "proceeds" as distinct from "profits" in statutes that serve a similar purpose. The State points out that fines and forfeitures provisions serve the same ends as the money laundering statute in that they seek to prevent criminals from enjoying the fruits of their crimes. The money laundering statute went into effect on January 1, 1988, and, at that time, there were several forfeiture provisions in effect that used the term "profits or proceeds." For example, section 11-20.1(f)(1)(A) of the Criminal Code of 1961 required that someone convicted of child pornography forfeit to the State of Illinois "any profits or proceeds" generated by that offense. Ill. Rev. Stat. 1987, ch. 38, ¶ 11-20.1(f)(1)(A); see also Ill. Rev. Stat. 1985, ch. 23, ¶ 8A-7(d) (requiring forfeiture of "monies, profits or proceeds" acquired from public aid fraud); Ill. Rev. Stat. 1987, ch. 56½, ¶ 1655(a)(3) (requiring forfeiture of "any profits or proceeds" acquired or maintained as a result of narcotics racketeering). Similarly, when the legislature enacted the money laundering statute, statutes relating to fines in drug cases used the phrase "profits or other proceeds" when setting forth how a fine should be determined.

See Ill. Rev. Stat. 1985, ch. 56½, ¶ 710.1(b)(2) (Cannabis Control Act); Ill. Rev. Stat. 1985, ch. 56½, ¶ 1411.1(b)(2) (Illinois Controlled Substances Act); Ill. Rev. Stat. 1987, ch. 56½, ¶ 1655.1(b)(2) (Narcotics Profit Forfeiture Act). Thus, it is clear that, when the legislature enacted the money laundering statute, it had established a distinct pattern in criminal statutes of using the term "proceeds" to mean something distinct from "profits." If, in the above statutes, the legislature meant the term "proceeds" to mean "profits," then it would be using the redundant phrase "profits or profits" or "profits or other profits." See *Bucci*, 582 F.3d at 123 ("To interpret the term 'proceeds' in the phrase 'profits or other proceeds' to mean profits would render the word 'profits' redundant."). We construe statutes so as not to render any term superfluous. *Cryns*, 203 Ill. 2d at 280.

¶ 39    We explained earlier that a cardinal rule of statutory construction is that a court must consider the reason for the law, the problems sought to be remedied, the purposes to be achieved, and the consequences of construing the statute one way or another. *Garcia*, 241 Ill. 2d at 421. In this vein, we share the concerns of the *Santos* dissent that the objectives of money laundering laws–providing deterrence in preventing criminals from using funds to support a luxurious lifestyle and inhibiting the growth of criminal enterprises–would be frustrated with a "profits" definition because dirty money may be used for these purposes even during times when the underlying activity is unprofitable. We find it highly unlikely that the Illinois legislature was perfectly fine with criminals laundering money in those instances in which a net gain was not realized in the underlying transaction.

¶ 40    We likewise share the concern of the *Santos* dissent that a "profits" definition would present difficult problems of proof that the legislature could not have intended. As the *Santos* dissent noted, there are no generally accepted accounting rules for criminal enterprises, tracing funds back to particular transactions and proving that they were profitable would often be difficult if not impossible, and prosecutions of professional money launderers would be difficult because the professional money launderer will often not know or care if the funds represented a net profit.

¶ 41    The *Santos* plurality brushed these concerns aside with the observation that ambiguous criminal provisions are interpreted in favor of defendants, not prosecutors. *Santos*, 553 U.S. at 519. Defendant echoes this argument in her brief. Such an argument misses the mark. We are not construing the statute in favor of prosecutors. Rather, we are doing what we always do in interpreting statutes, which is considering the reasons for the law and the consequences of construing it one way or the other. As the *Santos* dissent explained, the "point in citing the accounting and proof problems that would be produced by a net income interpretation is not that the 'receipts' interpretation is preferable because 'it is easier to prosecute,' [citation] but that creating these obstacles would serve no discernable purpose." *Santos*, 553 U.S. at 542 (Alito, J., dissenting, joined by Roberts, C.J., Kennedy and Breyer, JJ.). It is difficult to believe that the legislature would enact a criminal statute designed to address a serious problem while at the same time making violations of the statute exceedingly difficult to prove and effectively exempting from prosecution a class of transactions that further the very evils that the legislature intended to combat. Congress confirmed with its amendment to the federal money laundering statute that it had no such intent, and we do not believe that the Illinois legislature did either.

¶ 42    We also do not believe that the potential for a "merger problem" in a given situation is any reason to adopt a "profits" reading. In Illinois, any such problems could be resolved under the "one-act, one-crime" doctrine. See *People v. Miller*, 238 Ill. 2d 161, 165-76 (2010) (setting forth in detail how the one-act, one-crime doctrine is to be applied).

¶ 43    Finally, we address defendant's argument that we must employ the rule of lenity and construe the ambiguity in defendant's favor. Defendant essentially argues that, once the court identifies an ambiguity in a criminal statute, it must be construed in the defendant's favor.[3] We have said repeatedly, however, that the rule of lenity must not be stretched so far or applied so rigidly as to defeat the legislature's intent. See *People v. Jackson*, 2011 IL 110615, ¶ 21; *Garcia*, 241 Ill. 2d at 427; *Jones*, 223 Ill. 2d at 581; *In re Detention of Powell*, 217 Ill. 2d 123, 142 (2005); *People v. Brooks*, 158 Ill. 2d 260, 264 (1994); *People v. Bratcher*, 63 Ill. 2d 534, 542 (1976). The United States Supreme Court has explained how the rule of lenity is to be applied:

> "Finally, petitioners and the dissent invoke the 'rule of lenity.' The simple existence of some statutory ambiguity, however, is not sufficient to warrant application of that rule, for most statutes are ambiguous to some degree. Cf. *Smith*, 508 U.S., at 239 ('The mere possibility of articulating a narrower construction ... does not by itself make the rule of lenity applicable'). ' "The rule of lenity applies only if, 'after seizing everything from which aid can be derived,' ... we can make 'no more than a guess as to what Congress intended.' " ' *United States v. Wells*, 519 U.S. 482, 499 (1997) (quoting *Reno v. Koray*, 515 U.S. 50, 65 (1995), in turn quoting *Smith*, *supra*, at 239, and *Ladner v. United States*, 358 U.S. 169, 178 (1958)). To invoke the rule, we must conclude that there is a ' " 'grievous ambiguity or uncertainty' " in the statute.' *Staples v. United States*, 511 U.S. 600, 619, n.17 (1994) (quoting *Chapman v. United States*, 500 U.S. 453, 463 (1991)). Certainly, our decision today is based on much more than a 'guess as to what Congress intended,' and there is no 'grievous ambiguity' here. The problem of statutory interpretation in these cases is indeed no different from that in many of the criminal cases that confront us. Yet, this Court has never held that the rule of lenity automatically permits a defendant to win." *Muscarello v. United States*, 524 U.S. 125, 138-39 (1998).

See also *Santos*, 553 U.S. at 548 (Alito, J., dissenting, joined by Roberts, C.J., Kennedy and Breyer, JJ.) ("the rule of lenity does not require us to put aside the usual tools of statutory interpretation or to adopt the narrowest possible dictionary definition of the terms in a criminal statute").

¶ 44    While the meaning of the word "proceeds" in section 29B-1 is ambiguous, we not believe that it is a "grievous ambiguity," and we are not left with a mere "guess" as to what the legislature intended. The *Santos* plurality argued that, pursuant to the rule of lenity, "the tie

---

[3]Defendant also argues that the rule of lenity applies with the most force in enhancement provisions. As the word "proceeds" in section 29B-1 is not an enhancement provision, but rather merely one part of the definition of an element of the offense of money laundering, we will consider this argument no further.

must go to the defendant." *Santos*, 553 U.S. at 514. We do not believe that this is a "tie." Rather, we agree with the *Santos* dissent that "the meaning of 'proceeds' in the money laundering statute emerges with reasonable clarity when the term is viewed in context, making the rule of lenity inapplicable." *Id.* at 548-49 (Alito, J., dissenting, joined by Roberts, C.J., Kennedy and Breyer, JJ.).

¶ 45                              CONCLUSION

¶ 46      We hold that the trial court did not err in allowing the State to establish defendant's guilt of money laundering with evidence of UPT's receipts rather than its profits. Accordingly, we reverse that portion of the appellate court's judgment that vacated defendant's money laundering conviction. In all other respects, we affirm the appellate court's judgment.

¶ 47      Appellate court judgment affirmed in part and reversed in part;

¶ 48      circuit court judgment affirmed.