# Illinois Official Reports

## Supreme Court

---

### *People v. Chenoweth*, 2015 IL 116898

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. BARBARA J. CHENOWETH, Appellee. |
| Docket No. | 116898 |
| Filed | January 23, 2015 |
| Held (*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Where a defendant charged with felony exploitation of the elderly had been granted a property power of attorney by the victim, the statutory limitation provision on theft involving breach of a fiduciary obligation was applicable, and, in allowing prosecution "within one year after the proper prosecuting officer becomes aware of the offense," rendered timely the three-count indictment filed within one year of the date on which the state's attorney received from an elder-services detective with the police department the report on which the indictment would be based. |
| Decision Under Review | Appeal from the Appellate Court for the Fourth District; heard in that court on appeal from the Circuit Court of Adams County, the Hon. William O. Mays, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on
Appeal

Lisa Madigan, Attorney General, of Springfield, and Jonathan H. Barnard, State's Attorney, of Quincy (Carolyn E. Shapiro, Solicitor General, and Michael M. Glick and Drew Meyer, Assistant Attorneys General, of Chicago, of counsel), for the People.

Michael J. Pelletier, State Appellate Defender, Jacqueline L. Bullard, Deputy Defender, and Janieen R. Tarrance, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Springfield, for appellee.

Justices

JUSTICE Freeman delivered the judgment of the court, with opinion.

Chief Justice Garman and Justices Thomas, Kilbride, Karmeier, Burke, and Theis concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a bench trial in the circuit court of Adams County, defendant, Barbara J. Chenoweth, was convicted of financial exploitation of an elderly person (720 ILCS 5/16-1.3(a) (West 2004)) and sentenced to four years' probation and ordered to pay $32,266 in restitution. A divided panel of the appellate court vacated the conviction, holding that the extended period of limitations (720 ILCS 5/3-6(a)(2) (West 2004)) had expired prior to her prosecution. 2013 IL App (4th) 120334. This court allowed the State's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Feb. 26, 2010). We now reverse the judgment of the appellate court and remand the cause to that court for disposition.

¶ 2                          I. BACKGROUND

¶ 3    The victim, Ella Stathakis, was born in 1928. Defendant was the daughter of Ella's husband and is Ella's stepdaughter. In 2003, Ella's husband died. In March 2003, Ella granted property power of attorney to defendant. In June 2004, Ella moved from her home of 25 years to the Sycamore Nursing Home, both of which are located in Quincy. Sometime after her move, Ella directed defendant to sell the house. In March 2005, defendant sold Ella's house and deposited some of the proceeds of the sale in Ella's checking account with Bank of America.

¶ 4    In September 2008, Ella granted property power of attorney to the West Central Illinois Area Agency on Aging in the person of Director Lynn Niewohner. In October 2008, agency employees contacted Detective Thomas Liesen, the elder-services officer with the Quincy police department. They informed him that money from the March 2005 sale of Ella's house was missing.

¶ 5    Detective Liesen testified at the preliminary hearing as follows. On October 15, 2008, he interviewed Ella at her nursing home. Ella, then 80 years old, could not see or hear well and required assistance to walk, but she could understand and verbally communicate. According to Detective Liesen, "[Ella] was wondering where the funds went from the sale of her home, wanted to know where it went. She had never been told, and she just wanted to know where it

was." According to Detective Liesen, "she had no actual knowledge at that time how the funds out of her account had been spent, whether it was lawfully or unlawfully." He "had no real information as to whether the expenditures of [defendant] or the withdrawals from *** Ella's account were lawful or unlawful." Detective Liesen further testified: "[Ella] didn't know the nature of the transactions. I didn't ask her whether these transactions were authorized or not until after I received the information from the subpoena."

¶ 6   Two days after interviewing Ella, Detective Liesen caused a subpoena to issue for Ella's Bank of America checking account records from December 2004 through July 2005. He received the records in the mail on December 2, 2008, and began to analyze them, creating a spreadsheet to track what he believed to be suspicious payments. Liesen regarded as suspicious checks payable to "cash," checks payable to Mark Twain Casino, a check payable to the utility company for defendant's address, and a check payable to the telephone company for defendant's daughter's telephone.

¶ 7   The bank records also indicated that defendant presented several checks for deposit in Ella's checking account, but retained substantial portions of each check in cash and deposited only the remainder. For example, in March 2005, defendant presented for deposit a check for $44,007.75, which constituted the proceeds from the sale of Ella's house. However, defendant actually deposited only $34,007.75. Of the $10,000 defendant retained, she obtained a cashier's check payable to a local automobile dealer for $4,000 to purchase a car for her daughter Christina Shannon. Also, some of these partially deposited checks were drawn on a line of credit provided by Beneficial Corporation to fund renovations to Ella's house. At the time of Detective Liesen's investigation, the Beneficial loan was in default and the subject of debt-collection efforts.

¶ 8   On December 5, 2008, Detective Liesen again spoke with Ella at her nursing home. Ella stated that she had not given defendant permission to use her funds to make payments to a casino, or for cash, or for Shannon's car. Ella stated that her money was to be used only to pay her own bills.

¶ 9   Detective Liesen subsequently interviewed defendant. Shannon was also present. Defendant stated as follows. She gave some of the cash from Ella's account directly to Ella. Defendant also used cash from the account to buy Ella food and clothes, maintain Ella's house, and pay Ella's bills and loans. She used $10,000 of the proceeds of the house sale to repay those who helped to get the house ready for sale and to pay individuals for what they had done for Ella, including herself and Shannon. Defendant acknowledged that she obtained a cashier's check drawn on Ella's account to buy Shannon a car "for everything that she had done for Ella." Defendant did not specify what Shannon had done to earn that $4,000.

¶ 10   Shortly thereafter, Detective Liesen interviewed the buyers of Ella's house, Amanda Phillips and her mother, Jeanette Phillips. They stated not only that very little had been done to renovate the house prior to sale, but also that the house had not even been cleaned. Liesen also contacted Beneficial Corporation, which referred him to the firm handling the debt collection on the defaulted home-improvement loan.

¶ 11   Pursuant to standard procedure, Detective Liesen then prepared an initial report detailing his investigation. Liesen forwarded the report to his sergeant for review. The sergeant then sent Liesen's report to the Adams County State's Attorney, who received it on January 22, 2009.

¶ 12    Liesen thereafter continued his investigation, subpoenaing defendant's and Shannon's checking account records, in addition to the records of the Beneficial loan. He submitted a supplemental report in March 2009. In December 2009, Detective Liesen testified regarding the case before a grand jury.

¶ 13    On December 21, 2009, the State filed a three-count indictment charging defendant with financial exploitation of an elderly person. All counts charged that defendant committed the offense between December 2004 and July 2005, with each count alleging that defendant had misappropriated a different amount of money.

¶ 14    Defendant filed a motion to dismiss the indictment. She contended that the State did not commence prosecution within the standard three-year period of limitations (720 ILCS 5/3-5(b) (West 2004)), and that the indictment failed to allege any circumstances that would have placed the indictment within the one-year extended limitations period provided by section 3-6(a)(2) of the Criminal Code of 1961 (720 ILCS 5/3-6(a)(2) (West 2004)). The State filed a motion that sought leave to file an information alleging why the extended statute of limitations had not expired, and to dismiss the indictment upon filing of the information. The circuit court granted the State's motion. The State filed an information charging defendant with the same three counts alleged in the indictment. Additionally, each count alleged that the one-year extended limitations period provided by section 3-6(a)(2) had not expired because defendant was indicted on the same charge on December 21, 2009, which was within one year of January 22, 2009, when the investigative file was referred to the Adams County State's Attorney and he thereby became aware of the offense.

¶ 15    Defendant moved to dismiss the information, contending that the State filed the charges after the extended limitations period had expired. The circuit court disagreed and denied defendant's motion to dismiss. The court found that the extended limitations period commenced on January 22, 2009, when the police report was delivered to the Adams County State's Attorney, and defendant was indicted within one year of that date.

¶ 16    Defendant waived her right to a jury trial. At the conclusion of defendant's bench trial, the circuit court found defendant guilty of financial exploitation of an elderly person. The court denied defendant's posttrial motions and entered judgment on the most serious charge. The court sentenced defendant to four years' probation and ordered her to pay $32,266 in restitution.

¶ 17    On appeal, defendant argued, *inter alia*, that her conviction must be vacated because the State charged her after the statute of limitations had expired and failed to allege any circumstances that would have placed the indictment within the one-year extended limitations period established by section 3-6(a)(2). A divided panel of the appellate court agreed and vacated defendant's conviction, holding that she was indicted after the extended limitations period had expired. 2013 IL App (4th) 120334, ¶¶ 27-28. The dissenting justice regarded the prosecution as timely. *Id.* ¶ 35 (Pope, J., dissenting).

¶ 18    The State appeals to this court. Additional pertinent background will be discussed in the context of our analysis.

¶ 19                                    II. ANALYSIS

¶ 20    The indictment charged defendant with committing the offense between December 2004 and July 2005. The parties agree that the indictment date of December 21, 2009, rather than the

date of the subsequent information, is controlling for purposes of our analysis. See 720 ILCS 5/3-7(c) (West 2004); *People v. Gray*, 396 Ill. App. 3d 216, 224 (2009) (citing *People v. Cray*, 209 Ill. App. 3d 60, 65 (1991)). However, the parties dispute which event prior to defendant's December 21, 2009, indictment activated section 3-6(a)(2) of the Criminal Code of 1961 (720 ILCS 5/3-6(a)(2) (West 2004)) and, consequently, whether defendant was indicted within that section's one-year extended limitations period. This issue requires us to construe the statutory language that triggers the extension. Statutory construction is a question of law, which is reviewed *de novo*. *People v. Gutman*, 2011 IL 110338, ¶ 12; *People v. Zimmerman*, 239 Ill. 2d 491, 497 (2010).

¶ 21      The principles guiding our review are familiar. The primary object in construing a statute is to ascertain and give effect to the intent of the legislature. The most reliable indicator of legislative intent is the language of the statute, given its plain and ordinary meaning. *People v. Jackson*, 2011 IL 110615, ¶ 12; *People v. Botruff*, 212 Ill. 2d 166, 174 (2004). Further, when a statute defines the very terms it uses, those terms must be construed according to the definitions contained in the statute. *State Farm Mutual Automobile Insurance Co. v. Universal Underwriters Group*, 182 Ill. 2d 240, 244 (1998); see *People v. Olsson*, 2011 IL App (2d) 091351, ¶ 6. A court must view the statute as a whole, construing words and phrases in light of other relevant statutory provisions and not in isolation. Each word, clause and sentence of a statute must be given a reasonable meaning, if possible, and should not be rendered superfluous. The court may consider the reason for the law, the problems sought to be remedied, the purposes to be achieved, and the consequences of construing the statute one way or another. Also, a court presumes the General Assembly, in its enactment of legislation, did not intend absurdity, inconvenience, or injustice. *People v. Perez*, 2014 IL 115927, ¶ 9; *People v. Hunter*, 2013 IL 114100, ¶ 13.

¶ 22      A statute of limitations represents a legislative assessment of the relative interests of the State and the defendant in administering and receiving justice. *United States v. Marion*, 404 U.S. 307, 322 (1971). The establishment of limitations periods is properly left to the legislature based on its determination of what the public policy of this State should be with respect to specific crimes. See *People v. Isaacs*, 37 Ill. 2d 205, 229 (1967); *People v. Berg*, 277 Ill. App. 3d 549, 552 (1996).

¶ 23      Section 3-5(b) of the Criminal Code of 1961 provides that, subject to exceptions specified in subsection (a), a prosecution for a felony must be commenced within three years after the commission of the offense, unless the statute describing the offense provides otherwise, or section 3-6 extends the limitations period. 720 ILCS 5/3-5(b) (West 2004). Defendant's offense, financial exploitation of an elderly person, is a felony, and the section describing the offense does not provide for its own limitations period. 720 ILCS 5/16-1.3(a) (West 2004). Further, the December 21, 2009, indictment was filed more than three years after defendant committed the offense.

¶ 24      However, section 3-6 extends the general statute of limitations in several circumstances. For theft involving a breach of fiduciary obligation to the aggrieved person, section 3-6(a) provides, in pertinent part, that prosecution may be commenced:

> "within one year after the *discovery of the offense* by an aggrieved person, or by a person who has legal capacity to represent an aggrieved person or has a legal duty to report the offense, and is not himself or herself a party to the offense; or in the absence

of such discovery, within one year after the proper prosecuting officer becomes aware of the offense. However, in no such case is the period of limitation so extended more than 3 years beyond the expiration of the period otherwise applicable." (Emphasis added.) 720 ILCS 5/3-6(a)(2) (West 2004).

¶ 25    In the instant case, the appellate court concluded that Ella, the aggrieved person, "discovered the offense" on December 5, 2008, when she learned from Detective Liesen that defendant had written checks from her checking account that she had not authorized. According to the appellate court, this event triggered the one-year extended limitations period of section 3-6(a), which expired on December 5, 2009. Therefore, according to the appellate court, defendant's December 21, 2009, indictment was filed after the extended limitations period had expired. 2013 IL App (4th) 120334, ¶¶ 27-28.

¶ 26    Before this court, the State contends that Ella did not "discover the offense," within the meaning of section 3-6(a)(2), prior to the proper prosecuting officer becoming aware of the offense. According to the State, on January 22, 2009, the Adams County State's Attorney became aware of the offense when it received the police investigation file. The State argues that this event activated section 3-6(a)(2) and, consequently, defendant was indicted within that section's one-year extended limitations period. We agree with the State.

¶ 27    The statutory phrase "discovery of the offense" is clear and unambiguous. In the context of the statute, the word "discovery" means "the act, process, or an instance of gaining knowledge of or ascertaining the existence of something previously unknown or unrecognized *** the act or an instance of finding or finding out (as something that was lost or hidden) *** something that is discovered (as by being brought to light, disclosed, or ascertained)." Webster's Third New International Dictionary 647 (1993). The Criminal Code of 1961 itself defines "offense" as "a violation of any penal statute of this State." 720 ILCS 5/2-12 (West 2004). Thus, the phrase "discovery of the offense" means gaining knowledge or finding out that a criminal statute has been violated. We observe that over 40 years ago our appellate court correctly construed this phrase in another subdivision of section 3-6. *People v. McGreal*, 4 Ill. App. 3d 312, 320-21 (1971) (construing 720 ILCS 5/3-6(b) (West 2004) as previously codified); see *Commonwealth v. Hawkins*, 439 A.2d 748, 750 (Pa. Super. 1982) (quoting *McGreal*).

¶ 28    Defendant posits that on December 5, 2008, when Ella learned from Detective Liesen that defendant had written unauthorized checks on Ella's checking account, Ella "knew that a criminal offense had occurred." Defendant's argument erroneously equates the loss with a crime. The December 5, 2008, interview informed Ella that several specific losses occurred, which raised the *suspicion* that a crime may have been committed. However, section 3-6(a)(2) requires more than mere suspicion of a crime, or even awareness of a loss. Rather, activation of section 3-6(a)(2) requires awareness or knowledge that there has been a violation of a penal statute. A suspicion of a crime may lead to further investigation, but it does not of itself constitute "discovery of the offense." See *McGreal*, 4 Ill. App. 3d at 320-21. As of December 5, 2008, Ella had no awareness or knowledge that a crime occurred.[1] Applying

---

[1]Because Ella had *no* knowledge that a crime occurred, we need not and do not discuss the extent of the aggrieved person's knowledge of criminal activity sufficient to activate section 3-6(a)(2). See *People v. Campa*, 217 Ill. 2d 243, 269-70 (2005) (reviewing court will not decide nonessential issues or render advisory opinions).

section 3-6(a)(2), as construed, to the case at bar, we conclude that Ella did not "discover the offense" prior to the Adams County State's Attorney becoming aware thereof.

¶ 29 However, according to the appellate court, "Ella knew when she spoke to Detective Liesen on December 5, 2008, defendant had written checks from her account which she had not authorized. *** This was more than mere suspicion. As of December 5, 2008, Ella discovered defendant misappropriated her money and, thus, had knowledge an offense had been committed." 2013 IL App (4th) 120334, ¶ 27. The record belies this reasoning.

¶ 30 The appellate court failed to consider the authorization that Ella had granted to defendant through the property power of attorney. The legislature has expressly declared: "The General Assembly finds that the public interest requires a standardized form of power of attorney that individuals may use to *authorize* an agent to act for them in dealing with their property and financial affairs." (Emphasis added.) 755 ILCS 45/3-1 (West 2004).

¶ 31 On March 13, 2003, Ella signed an Illinois statutory short form power of attorney for property as provided in section 3-3 of the Statutory Short Form Power of Attorney for Property Law (Property Power of Attorney Law). 755 ILCS 45/3-3 (West 2002). The form begins with a notice in capital letters that explains: "The purpose of this power of attorney is to give the person you designate (your 'agent') broad powers to handle your property, which may include powers to pledge, sell or otherwise dispose of any real or personal property *without advance notice to you or approval by you*." (Emphasis added.) *Id*. In the signed form, Ella did not indicate any limitation or restriction regarding property powers and transactions, and the phrase "no limitations" was typed in the blank provided. Additionally, in capital letters, Ella granted defendant "authority to employ other persons as necessary to enable the agent to properly exercise the powers granted in this form." 755 ILCS 45/3-3(3) (West 2002). Also, defendant was "entitled to reasonable compensation for services rendered as agent under this power of attorney." 755 ILCS 45/3-3(5) (West 2002).

¶ 32 Considering Ella's grant of property power of attorney to defendant, the appellate court's reasoning fails. On December 5, 2008, Ella did not "know" that defendant had "misappropriated" Ella's money by writing checks on Ella's checking account that she did not authorize. 2013 IL App (4th) 120334, ¶ 27. Indeed, based on the property power of attorney, defendant was "*authorized* to: open, close, continue and control all accounts and deposits in any type of financial institution ***; deposit in and withdraw from and *write checks on* any financial institution account or deposit." (Emphases added.) 755 ILCS 45/3-4(b) (West 2002). Merely because Ella knew that unauthorized checks had been written did not mean that Ella knew there had been a misappropriation of her money.

¶ 33 Nonetheless, defendant contends that on December 5, 2008, Ella knew that defendant had used her assets not for her benefit. Of course, the agent under a property power of attorney cannot run amok. The Property Power of Attorney Law explains that the agent is under no duty to exercise granted powers or to assume control of the principal's property, "but when granted powers are exercised, the agent will be required to use due care to act for the benefit of the principal in accordance with the terms of the statutory property power and will be liable for negligent exercise." 755 ILCS 45/3-4 (West 2004). Also, "the agent will not have power *** to make gifts of the principal's property." *Id*. The "power to make gifts" must be specifically added to the statutory short form (755 ILCS 45/3-3(3) (West 2004)), and was not added to the form signed by Ella.

¶ 34    However, as of December 5, 2008, Detective Liesen's investigation had not uncovered any evidence indicating that defendant's expenditures were gifts prohibited by the power of attorney. More to the point, Ella did not "know" whether the expenditures fit that characterization. Although Ella disapproved of defendant's expenditures, the Property Power of Attorney Law charged Ella with knowing only that defendant might be liable for negligent exercise of a duty of due care. At most, Ella suspected, but did not know, that defendant had committed a crime.

¶ 35    This is the type of situation in which the legislature intended to provide a remedy for victims such as Ella. The legislature designed section 3-6 "to permit increases in the general time limitations with respect to certain offenses which are capable of being readily concealed by the offender, from both the victims and the law enforcing authorities, over substantial periods of time and beyond the general limitations applicable to those offenses." Ill. Ann. Stat., ch. 38, ¶ 3-6, Committee Comments—1961, at 176 (Smith-Hurd 1989). The legislature enacted section 3-6(a) specifically to deal with the offender who has successfully avoided detection of his or her breach of fiduciary obligation for the term of the general time limitation. *Id*. Prior to section 3-6, "Illinois had no statute recognizing the limitation problem as to *** private offenders in offenses involving fraud or a breach of fiduciary obligation." *Id*. at 178. The legislature regarded such a statute "advisable in view of the comparatively short (3-year) general limitation in this State." *Id.* The legislature deemed the "most appropriate solution *** to be to extend the general period for a further term which is related to the discovery of the particular offense; but to fix a limit upon the length of the extension." *Id*.

¶ 36    Accordingly, the one-year extended period of limitations provided by section 3-6(a)(2) did not commence on December 5, 2008. Rather, the limitations period commenced on January 22, 2009, when the Adams County State's Attorney became aware of the offense when he received the police investigation file. Since defendant was indicted within one year of that date, her prosecution commenced within the extended limitations period provided by section 3-6(a)(2). Consequently, the appellate court erred in vacating defendant's conviction.

¶ 37    Finally, before the appellate court, defendant additionally contended, and the State conceded, that she was entitled to a statutory credit for time served in pretrial custody. However, the appellate court did not address this issue because the court considered the limitations issue to be dispositive. 2013 IL App (4th) 120334, ¶ 30. Therefore, we remand the cause to the appellate court for disposition of defendant's remaining contention. See, *e.g.*, *People v. Givens*, 237 Ill. 2d 311, 339 (2010).

¶ 38                                    III. CONCLUSION

¶ 39    For the foregoing reasons, the judgment of the appellate court is reversed, and the cause is remanded to the appellate court for disposition.

¶ 40    Reversed and remanded.